Elvira I. BAKER, Appellant–Respondent,

v.

Glen WHITAKER and Robert Shirkey,
Respondents–Appellants.

Elvira I. BAKER, Appellant,

v.

Glen WHITAKER and Robert
Shirkey, Respondents.

Nos. WD 48382, WD 48430.

Missouri Court of Appeals,
Western District.

Sept. 27, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 1, 1994.

Application to Transfer Denied
Dec. 20, 1994.

Roland B. Miller, III, Kansas City, for appellant.

Jack B. Robertson, Kansas City, for respondents.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

HANNA, Judge.

This action involves a dispute over attorney fees between Elvira Baker,[1] now deceased, and her former attorneys, Glen Whitaker and Robert Shirkey, who represented her in a personal injury suit. The court entered judgment in favor of Ms. Baker for the amount of three unpaid medical bills and both parties appealed. Reversed and remanded.

On April 14, 1989, Ms. Baker was struck and run over by a school bus owned by D &

---

1. The substituted plaintiff in this action, Charlene Brown, is Ms. Baker's niece and personal representative.

R Transportation (D & R) as she was walking in a crosswalk at the intersection of Linwood and Woodland Avenue. The accident occurred when the school bus, driven by Michael Wagner, an employee of D & R, made a left hand turn onto Linwood and failed to yield to Ms. Baker who was crossing in the crosswalk on a green light. Ms. Baker, who was 81 years old at the time of the accident, sustained several serious and permanent injuries. As a result of her extensive injuries, Ms. Baker remained in hospitals and nursing homes until her death on February 28, 1993. Wagner subsequently plead guilty to careless driving. There was no indication of any fault on the part of Ms. Baker. D & R and Wagner were insured by State Farm Insurance Company. Within two weeks of the accident, a State Farm adjuster contacted Truman Medical Center and some family members of Ms. Baker.

After the accident, Ms. Baker was taken to Truman Medical Center where she remained until October 31, 1989. Ms. Baker and Mr. Whitaker had previously met as members of the Heart of American Genealogical Society. When Mr. Whitaker, at Ms. Baker's request, visited her at the hospital on June 30, 1989, she was attached to a ventilator, under medication, unable to talk, and hard of hearing and sight. Mr. Whitaker met with Ms. Baker to discuss preparing a will for her and representing her in her claim against the bus company. All communications between them were handwritten. Mr. Whitaker discussed the cost of preparing the will and advised her that his fee for representing her in the lawsuit would be determined on a contingency basis with his fee being 50% of the money paid to her.

Mr. Whitaker returned to the hospital on July 12, 1989, with a prepared will. At that time, Ms. Baker informed him that she had heard that State Farm would pay all her medical expenses. Mr. Whitaker responded that State Farm had done nothing but delay matters and asked Ms. Baker if she wanted to file a lawsuit. She indicated that she did. On that same day, Mr. Whitaker prepared a handwritten contingent fee contract which Ms. Baker signed. The contract in its entirety was as follows:

I HEREBY HIRE GLEN L. WHITAKER AND ASSOCIATES TO REPRESENT ME AS MY ATTORNEYS–AT–LAW AND PROSECUTE FOR ME ANY AND ALL CLAIMS FOR DAMAGES AND INJURIES SUSTAINED BY ME RESULTING FROM OR TO RESULT FROM THE D & R BUS COMPANY BUS (D & R BUS) CARELESSLY HITTING ME APRIL 14, 1989, AND MR. WHITAKER AND HIS ASSOCIATES' FEE SHALL BE 50% CONTINGENT OF ANY AMOUNTS PAID ME BY ANYONE OR ANY COMPANY BECAUSE OF MY CLAIMS, AND COURT COSTS AND REQUIRED PROSECUTION OF CLAIMS OR LAWSUITS SHALL BE PAID BY ME.

Mr. Whitaker subsequently made an oral agreement with Mr. Robert Shirkey that they would split the attorney fee 1/3 to Mr. Whitaker and 2/3 to Mr. Shirkey. This agreement was not discussed with Ms. Baker, although later she became aware that Mr. Shirkey was handling the litigation.

On July 21, 1989, Mr. Shirkey filed a lawsuit on her behalf against D & R and Wagner. On being informed of the amount of coverage on the school bus and driver, Mr. Shirkey made a demand on State Farm for $1,000,000 in full settlement of all claims Ms. Baker had against D & R and Wagner. During the negotiations, Mr. Shirkey advised State Farm's counsel that Ms. Baker's medical bills exceeded $250,000.[2]

In August 1990, State Farm agreed to pay $1,000,000 to settle the lawsuit. On August 15, 1990, the defendants presented Ms. Baker with a release prepared by State Farm for her to sign. This document was a release of all of her claims against D & R and Wagner. Dr. Ronald LaHue, Ms. Baker's treating physician at Swope Ridge, signed the second page of the release but crossed out the lan-

---

2. In October 1989, Ms. Baker was transferred to Swope Ridge Geriatric Center. From January 25, 1990, until February 19, 1990, she was hospitalized at Baptist Medical Center. In January 1992, she was transferred to a nursing home in Moberly where she lived until her death in February 1993.

guage which stated that Ms. Baker was of sound mind and under no constraint or undue influence. Mr. Shirkey subsequently hired Dr. Logan, a physician from the Menninger Clinic, to perform a psychiatric examination on Ms. Baker. Dr. Logan found Ms. Baker to be of sound mind and witnessed her signature on a second and identical release form stating that she was accepting the $1,000,000 as a release of her claims against D & R and Wagner.

State Farm requested a competency hearing, which was conducted in September 1990. The court held that Ms. Baker was competent to sign the release. State Farm issued three separate checks totaling $1,000,000. One check for $767,000 was payable to Ms. Baker and her attorneys, Whitaker and Shir-

key. Two additional checks totaling $233,000 were payable to and tendered directly to Truman and Baptist for hospital bills incurred by Ms. Baker. While Ms. Baker was present and testified at the hearing, she was not questioned about her understanding of the terms of the settlement or the distribution of the proceeds, with one exception. She did testify that she wanted all the hospital bills paid. When asked whether she understood that she had signed a full release and whether she wanted the court to approve it, she answered, "I guess so."

Some months later after the court hearing, in December 1990, Ms. Baker signed a settlement statement prepared by Mr. Shirkey which itemized the litigation expenses and summarized the following amounts:

| RECEIVED IN SETTLEMENT | $ | 1,000,000.00 |
|---|---|---|
| [itemized litigation expenses listed] | | |
| TOTAL EXPENSES | $ | 1,757.95 |
| NET RECEIVED IN SETTLEMENT | $ | 998,242.05 |
| Attorney's Fee per contract (50%) | $ | 499,121.02 |
| NET DUE CLIENT | $ | 499,121.03 |

As reflected in the statement, the defendants received a total of $499,121.02 as their attorneys' fee. The litigation costs, which are shown as $1,757.95, were deducted from the total settlement proceeds prior to the calculation of attorney fees. The statement shows that Ms. Baker received a "net" amount of $499,121.03. At the bottom of the statement are handwritten figures reflecting the deduction of medical expenses from Ms. Baker's portion of the settlement totalling $237,051.84.[3] These deductions are not reflected in the typewritten portion of the statement, nor does the statement reflect what was later determined to be Ms. Baker's outstanding medical and nursing care bills. Pursuant to the agreement between the defendants, Mr. Whitaker's fee was $166,000 and Mr. Shirkey's fee was $333,000.

What apparently prompted this lawsuit was that, after State Farm made its payments to the hospitals, Truman Medical Cen-

ter sued Ms. Baker for $50,838.17 in unpaid medical bills. Subsequently, Ms. Baker received bills from Baptist for $13,890.13 and Swope Ridge for $24,304.50. After learning that these bills had not been paid, she filed a five-count petition against defendants Whitaker and Shirkey in April 1992, requesting the court to invalidate the fee agreement as unreasonable and unconscionable and to construe the agreement against the defendants. Motions for summary judgment were filed by both parties. In April 1993, the trial court denied both motions for summary judgment with the exception that the court dismissed count three of plaintiff's petition alleging a modified agreement.

Ms. Baker died on February 28, 1993. Ms. Baker's niece and personal representative, Charlene Brown, was substituted as the plaintiff. The case proceeded to trial without a jury in July 1993. In August 1993, the court entered judgment in favor of plaintiff

**3.** The settlement statement reflects that bills had been paid to the Department of Social Services ($1,551.84), Hospital Hill ($2,500), Baptist Medical Center ($50,822.17) and Truman Medical Center ($182,177.83).

for $64,728.30, which amount represented two medical bills from Truman and Baptist that had remained unpaid at the time of the settlement. In making its determination, the court noted that the fee charged by the defendants was not consistent with the practice in Jackson County and that "[i]t was customary for most attorneys to take a percentage of the net amount recovered." The court further noted that the fee agreement failed to comply with Rule 1.5(c) of the Missouri Rules of Professional Conduct.[4] Messrs. Whitaker and Shirkey subsequently filed a motion for new trial. The plaintiff filed a motion to amend the judgment requesting payment for an additional medical bill from Swope Ridge in the amount of $24,304.50. On September 2, 1993, the court entered a judgment overruling the defendants' motion for new trial but sustained the plaintiff's motion to amend and included the Swope Ridge medical bill in its judgment against the defendants. Both parties appealed.

Plaintiff raises five points on appeal. Two of the points are dispositive. The first point concerns whether Ms. Baker's acceptance of the division of funds at the time of the settlement precluded her from challenging the contract. The second issue involves the attorney/client contract, specifically whether the term "amounts paid me" was ambiguous. Because we reach our decision on these two points, it is not necessary to reach the questions the plaintiff raised concerning breach of the attorneys' fiduciary duties and whether, under these facts, a 50% contingent fee agreement is unconscionable.

■■■ In this case, the trial court determined that it was unable to enter judgment in accordance with the plaintiff's interpretation of the contract because Ms. Baker had ratified the contract when she "willingly and knowingly accepted the division of the moneys." Plaintiff argues that before a party can be charged with having ratified a contract, he or she must have full knowledge of all material facts of the transaction, citing

*Mathis v. Crane*, 360 Mo. 631, 230 S.W.2d 707, 714 (1950). The defendants respond that the contract of employment was fully performed and the court was without jurisdiction to rescind and change a fully executed contract. A contract that has been fully performed cannot be rescinded by one of the parties. *Hoback v. Allen*, 216 S.W.2d 148, 151 (Mo.App.1948).

The trial court found on the evidence presented that Ms. Baker was unaware that there were medical and nursing care bills that had not been paid at the time of the settlement hearing, that the defendants repeatedly assured her they would be paid, and that the settlement statement does not reflect any of these outstanding bills. Ms. Baker acquiesced in the division of moneys because she was assured by defendants that all of her medical bills would be satisfied. While these facts should have been explained to Ms. Baker before she signed the fee agreement and the settlement statement, our decision here follows a different path with the same result that the fee contract was not a completed agreement.

■■■ Mr. Whitaker was retained by Ms. Baker as her attorney to prosecute her claim against the bus company and its driver. The court's findings of fact make clear that the parties agreed that the contract terms included some type of resolution of her medical bills. Those bills were a primary concern of Ms. Baker. The trial court found, and it is supported by the evidence, that Ms. Baker wanted and repeatedly requested that counsel see to it that all of her medical bills were paid. Before the attorney/client contract is a completed contract, all aspects of the contract must be concluded. The medical bills incurred as of the date of settlement and their disposition were an integral part of this attorney/client contract. This is particularly true in this case in light of the contested phrase "amounts paid me." Without a resolution of the medical expenses a correct determination of the amount of defendant's at-

---

4. Rule 1.5(c) provides, in pertinent part, that a contingent fee agreement "shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and *other expenses to be deducted* from the recovery, and *whether such expenses are to be deducted before or after the contingent fee is calculated.*" (Emphasis added).

torney fees and, accordingly, the dollar amount of plaintiff's recovery cannot be made.

 While execution of a release and receipt of the settlement money will generally conclude the attorney/client relationship, it does not always do so. In this case, the trial court concluded that the attorney/client contract was fully executed. However, it is apparent that there remained an obligation on the part of the attorneys concerning the outstanding medical bills. Certainly, the attorneys would not have considered the contract terminated if the client had not paid the litigation expenses. Ms. Baker persuaded the trial court that the attorneys had additional obligations regarding the medical expenses. For an obligation to be implied into a contract, it must appear that such an obligation was clearly contemplated by the parties and that the inference of the obligation is necessary to effectuate the purpose of the contract. *Bayless Bldg. Materials Co. v. Peerless Land Co.*, 509 S.W.2d 206, 213 (Mo. App.1974).

The attorney/client contract was interpreted, under the facts here, to include conclusion of all outstanding medical bills incurred as of the time of the execution of the settlement release. The attorneys saw to it that certain medical expenses were resolved at the hearing but they left outstanding the three bills from Truman, Baptist and Swope Ridge. Bearing on this issue is the fiduciary relationship of the parties, which in this case, is exacerbated by the client's deteriorating physical condition and questionable competency. We hold that the attorney/client contract was not completed or fully performed at the time of the court hearing or when the defendants presented plaintiff with their settlement statement. The terms of the contract remained open to interpretation and specifically, whether the term "amounts paid me" is ambiguous.

 Plaintiff submits that if the contract language "amounts paid me" is ambiguous, the agreement should be construed to mean that medical and nursing expenses should have been deducted before the attorneys' fee was calculated.

 An agreement between an attorney and client should be construed under the same rules that apply to other contracts. *Knight v. DeMarea*, 670 S.W.2d 59, 63 (Mo. App.1984). "[C]ontracts are to be interpreted so as to reach fair, reasonable, and practical results, for it is to be presumed that the parties contracted to that end." *Id.* (*quoting Buffalow v. Bull*, 619 S.W.2d 913, 923 (Mo. App.1981)). Simply because the parties disagree on the interpretation of a contract does not render it ambiguous. *Jim Carlson Constr., Inc. v. Bailey*, 769 S.W.2d 480, 482 (Mo.App.1989). We must consider the disputed language in the context of the entire agreement and determine whether it is susceptible of more than one interpretation, giving the disputed words their plain and ordinary meaning. *Id.* at 482. A contract is "ambiguous" if it is susceptible to two or more interpretations and its meaning is unclear. *Page v. Green*, 758 S.W.2d 173, 175 (Mo.App.1988).

In a very similar factual case, the Southern District found in *Page* that a contingent fee agreement which provided that Page agreed to pay his attorney "twenty-five percent (25%) of any net amount recovered" was ambiguous. The court reached this result because the contract did not indicate whether medical and nursing expenses would be deducted before the attorney's fees were calculated. Interpreting the term "net amount," it concluded that the calculation would be made after deductions. *Id.* at 177. The question presented to that court, as here, was what deductions should be made before the attorney fee is determined? The court held the attorney fee agreement was ambiguous because the contract didn't answer the question. *Id.* at 175. In *Page*, both the father of the deceased claimant and an experienced attorney testified. The father testified his son's attorney said the 25% fee would be calculated excluding medical and nursing services. *Id.* The attorney testified that his interpretation would exclude medical expenses. *Id.* The Labor & Industrial Relations Commission agreed and set the fee after payment of medical and nursing expenses. The court upheld the Commission's determination. *Id.* at 175–77. The *Page*

court stated, "If there is room for dispute as to the scope of an attorney's retainer contract, the construction adopted is that most favorable to the client." *Id.* at 175. See also *Kramer v. Fallert,* 628 S.W.2d 671 (Mo.App. 1981), in which the court held that "net amount recovered or credited" in a contingent fee contract meant the computation of the attorney fee included monies remaining after deduction of any counterclaim or setoff. *Id.* at 674.

In order to reduce misunderstanding, Rule 1.5(c) of the Missouri Rules of Professional Conduct requires a contingent fee agreement to be in writing and to specify the expenses to be deducted from the recovery and whether those expenses will be deducted before or after the attorneys' fee is calculated. The contract here was susceptible to different interpretations for the same reason as in *Page,* in that it did not indicate whether medical expenses would be deducted before the attorneys' fee was calculated. The contract does not define "amounts paid me," nor does it specify what expenses, with the exception of the lawyer's litigation expenses, are to be deducted. The meaning of the term "amounts paid me" is unclear and capable of more than one interpretation. It is ambiguous and should be construed in accordance with the following legal principles.

■ Once the legal threshold question of the contract's ambiguity has been decided, there are certain principles of contract construction that are applicable to the situation at hand. First, we must be guided by the cardinal principle that the objective is to determine the true intent of the parties. *Boswell v. Steel Haulers, Inc.,* 670 S.W.2d 906, 913 (Mo.App.1984). To aid in construing an ambiguous contract, recourse must be had to evidence of the relationship of the parties, the circumstances surrounding execution of the contract, subject matter of the contract, acts of the parties in relation to the contract, and any other external circumstances which would cast light on the intent of the parties. *Id.* The practical construction which the parties themselves placed on an agreement is of considerable significance in determining the meaning of the terms of an ambiguous contract. *Shell v. Shell,* 658 S.W.2d 439, 444

(Mo.App.1982). Finally, the courts do not favor the destruction of agreements and, therefore, if feasible, construe a contract so as to carry into effect the reasonable intention of the parties. *Computer Network, Ltd. v. Purcell Tire & Rubber Co.,* 747 S.W.2d 669, 674 (Mo.App.1988).

■ An agreement that is ambiguous should be construed against the drafter. *Page,* 758 S.W.2d at 175. With regard to contingency fee contracts, attorneys may be entitled to a percentage of the amount collected under a judgment. *Kramer,* 628 S.W.2d at 674. However, the amount actually recovered has generally been held to mean the *net* amount recovered. *Id.* The net amount recovered is "the amount allowed by the judgment less the amount of any claim, expense, or offset that may properly be deducted therefrom." *Id.* (*citing* 7A C.J.S. *Attorney & Client* § 322 (1980)).

■ As the trial court pointed out, the literal translation of these terms would require a finding that the attorneys were entitled to one-half of any amounts that were actually paid directly to and received by Ms. Baker. This would exclude the medical expenses since separate checks were made directly payable to the hospitals. The payment of the medical expenses directly to the health care provider is a practical construction which the parties themselves placed on the attorney/client agreement and is a significant consideration in determining the meaning of the ambiguity "amounts paid me." *See Shell,* 658 S.W.2d at 444. If the defendants had intended that Ms. Baker's medical expenses were not going to be deducted from the total amount recovered before the calculation of their fee, the fee agreement should have specified that such a method of calculation would be used.

Since the court was precluded from making a determination of the meaning of "amounts paid me" by its own conclusion that it was a completed contract, we are remanding this case to the trial court for further proceedings to determine the proper amount of attorneys' fees based on 50% of the amount recovered from the settlement. This will require an interpretation of the phrase

"amounts paid me" in accordance with the principles of law set forth in order to determine the parties' intention. More to the point, the court must decide whether the agreement contemplated the deduction of medical and nursing care expenses before or after calculating the attorney fees.

There remains open some question whether there is a causal connection between the three outstanding bills and the accident, particularly the Swope Ridge nursing home bill. There also appears to be an issue as to whether the bills have been satisfied although this issue may have been fully litigated.[5] Apparently, none of the bills were filed in the probate court as claims against Ms. Baker's estate. We question the trial court's authority to order the bills paid by the defendants without giving the attorneys an opportunity to contest their validity. Finally, if the bills are to be paid in accordance with plaintiff's position, i.e., deducted before the computation of the 50% attorney fee, the defendants would not be responsible for the total bills, which the court has ordered them to pay. Rather, their fee would in effect be reduced by half of the amount of outstanding bills deducted before fee calculation.

In their sole point on appeal, Whitaker and Shirkey contend that the trial court was not authorized to enter a judgment against them for the amount of Ms. Baker's unpaid medical bills because the plaintiff did not request such relief in her petition. They also claim there was no evidence to support the judgment. This problem will not likely arise on remand as it is easily remedied, but in any event, the parties will have the benefit of their briefs filed with this court.

The judgment of the trial court is reversed and the matter remanded for disposition in accordance with this opinion.

All Concur.

---

5. We note that the suit brought by Truman against Ms. Baker for outstanding medical bills has been dismissed, although we do not know the reason for that dismissal.