**Margaret C. RATHBUN and Jack W. Rathbun, Trustees, For the Rathbun Trust Dated January 10, 1986, Plaintiffs–Appellants,**

v.

**The CATO CORPORATION, Defendant–Respondent.**

No. 24578.

Missouri Court of Appeals, Southern District, Division One.

Nov. 21, 2002.

Motion for Rehearing and Transfer Denied Dec. 13, 2002.

Application for Transfer Denied Jan. 28, 2003.

John C. Holstein, Michael D. Textor, Shughart Thomson & Kilroy, Springfield, for appellant.

Paul F. Sherman, Daniel, Powell & Kiefer, LLC, Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

Margaret C. Rathbun and Jack W. Rathbun, trustees of The Rathbun Trust ("Lessor"), filed suit against The CATO Corporation ("Lessee") for rent and possession, claiming that Lessee had not paid the full amount of lease payments required by a lease agreement entered into by the parties in July 1997 ("the Lease"). Lessee filed a counterclaim seeking a declaration that it was obligated to pay rent only in the amount it had been paying rather than the amount claimed by Lessor. Lessor appeals from an adverse judgment in which the trial court found for Lessee on the petition and on Lessee's counterclaim.

The leased premises was approximately 3300 square feet of commercial retail space ("the premises") at the Ozark Corners Shopping Center in Ozark, Missouri ("the shopping center"). The primary term of the Lease was five years, ending January 31, 2003, at a monthly rental of $2200. In addition, the Lease called for Lessee to pay three percent of its annual gross retail sales in excess of $880,000, as well as a pro rata share of the real estate taxes, insurance, and common area maintenance of the shopping center. It also provided for three automatic five-year renewals at increased rent unless Lessee gave notice of its intent not to renew.

When the parties entered into the lease, Wal–Mart Discount Department Store ("Wal–Mart") and Consumer Foods Grocery Store ("Consumers") were tenants on either end of the shopping center. The Lease contained the following provision, which is at issue here (the "Inducement provision"):

*27. INDUCEMENT.* As an inducement to LESSEE for entering into this Lease, LESSOR warrants that the following major anchor tenants are open for business, or will open for business prior to or concurrent with LESSEE . . . as follows:

WAL–MART DISCOUNT DEPARTMENT STORE 54,000 SQ. FT.
CONSUMER FOODS GROCERY STORE 33,539 SQ. FT.

LESSOR warrants that in the event either one of said tenants should not be open for business when LESSEE is scheduled to open for business, or should thereafter vacate its premises or cease its operations in the Shopping Center, then LESSEE may delay its opening date and rental commencement date until the first of LESSEE'S scheduled store opening seasons after both of said major anchor tenants are open for business. LESSEE shall also have the option to cancel this Lease, however, in such event; LESSOR shall have six (6) months after such major anchor tenant vacates or ceases operations in said space for said space to be occupied by another tenant open for business and operating a similar type and size business as that of such vacating tenant before LESSEE may exercise this option to cancel, and provided that LESSEE notifies LESSOR of its intent to cancel in writing thirty (30) days prior to such cancellation.
During the period of such major anchor tenant's vacancy, LESSEE may abate monthly fixed rent, annual percentage rent and all other charges payable hereunder by LESSEE, and pay LESSOR in lieu thereof, on a monthly basis, an amount equal to one-half (1/2) of the monthly fixed rent

that would otherwise be due under this Lease. See Exhibit "E".[1]

The Lease also provided that if occupancy of the shopping center fell below 80%, Lessee had the option, among other things, to remain in the premises with abatement of monthly rent, annual percentage rent, and other charges payable under the lease until the 80% occupancy threshold was met by Lessor. Finally, an exhibit to the Lease provided that Lessee would be allowed $26,400 in construction costs to accommodate its tenancy, and that Lessee would recover those costs by withholding $1100 in rent each month until the allowance was fully recovered.

Lessee occupied the premises beginning in November 1997, and deducted $1100 from its monthly fixed rent until October 1999 pursuant to the construction costs allowance. Consumers, however, ceased its operations in the shopping center in April 1999, causing the occupancy rate of the shopping center to be less than 80%. Lessee, relying on the 80% occupancy provisions of the Lease, paid no rent from May 1999 through October 1999 ($1100 was withheld as reimbursement of construction costs, and another $1100 was withheld because of the occupancy deficiency). In November 1999, having been reimbursed for its constructions costs, Lessee began paying monthly rent of $1100, relying on the Lease provision that a vacancy of one of the two anchor tenant locations permitted Lessee to pay one-half of the fixed monthly rent.

In August 2000, Lessee was notified by Lessor that a new tenant, Sutherland's Express Home Improvement Store ("Sutherland's"), had agreed to take the Consumers location, and that, beginning September 1, 2000, the rent would return to the $2200 fixed monthly payment and the re-

quirements for reimbursement of pro rata shares of other expenses provided for in the Lease would once again apply. Lessee, however, continued to pay only $1100 per month as fixed rent, and failed to pay its pro rata share of the common area maintenance, insurance and taxes.

The underlying suit followed. Following a bench trial, the court entered a judgment against Lessor on the petition, and for Lessee on the counterclaim, declaring Lessee was "entitled to pay at the abated rent amount of $1,100 per month for loss of major anchor tenant [Consumers], an amount equal to one-half (1/2) of the monthly fixed rent in lieu of all other charges hereafter." It also entered judgment for Lessee in the amount of $5100 for attorney fees. The trial court entered findings of fact and conclusions of law, including the following:

5. The language of Section 27 *INDUCEMENT*, is clear and explicit in providing [Lessee] a modification of rent to ½ of the monthly fixed rent during the period a major anchor tenant expressly identified as [Consumers] vacated the shopping center.

6. [Sutherland's] and [Consumers] are not similar type businesses in the fair and ordinary sense of their operations, one being a hardware store and the other a grocery store, so that [Sutherland's] is not a suitable replacement tenant for [Consumers].

*CONCLUSIONS OF LAW*

10. Words of the Lease Agreement, given their ordinary meaning, entitle [Lessee] at Section 27 to abate rent to ½ the fixed monthly rent in lieu of all other

---

**1.** Exhibit "E" provided, in part, that Lessee understood that Lessor did not own the space occupied by Wal–Mart, and that it was not Lessor's tenant.

charges for the vacancy of major anchor tenant [Consumers].

11. Abatement to ½ is a reasonable construction of the Lease Agreement so as to provide [Lessee] a substantial inducement to locate in the [Lessor's] shopping center its ladies apparel business between the traffic flow generated by and between a grocery store and a discount store.

12. The Lease Agreement between the parties is an integrated unambiguous written contract.

13. [Lessee] has paid in full its rent to date in accord with the [Lease].

14. This Court declares [Lessee] obligated to pay at the abated rent amount of $1,100.00/month per the [Lease] for loss of major anchor tenant [Consumers].

On this appeal, Lessor presents five points relied on, four of which relate to the construction of the Lease. The fifth relates to the testimony of an expert called by Lessee.

■ On appeal from a court-tried case, a judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or erroneously applies the law. *Parnell v. Sherman*, 899 S.W.2d 900, 901 (Mo.App. S.D.1995). In assessing challenges to the trial court's findings of fact, the appellate court defers to the trial court's superior ability to judge the credibility of witnesses. *Id.* While we defer to the trial court's factual findings, we independently evaluate its conclusions of law. *Kassebaum v. Kassebaum*, 42 S.W.3d 685, 692 (Mo.App. E.D.2001). In our review, we accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Id.*

■ Lessor first contends that the portion of the judgment declaring that Lessee

is entitled to pay abated rent of $1100 per month "hereafter" is inconsistent with the clear and unambiguous renewal provisions of the Lease, in that they provide that Lessee is to pay specified increases in rent if the Lease is renewed. Lessor's theory under this point is based on paragraph 6 of the Lease, entitled "Renewal Options." It provided, in part:

6(a) Provided LESSEE is not in default, upon expiration of the original term of this Lease on January 31, 2003 this Lease shall be automatically extended and renewed for a period of five (5) years from February 1, 2003 to January 31, 2008, under the same terms and conditions *except monthly fixed rent shall be TWO THOUSAND FOUR HUNDRED SEVENTY FIVE AND NO/100 DOLLARS ($2,475.00) plus percentage rent payable within ninety (90) days after the end of each Lease year equal to three percent (3%) of all completed gross retail sales made from the Premises in excess of base sales of NINE HUNDRED NINETY THOUSAND AND NO/100 DOLLARS ($990,-000.00)* unless at least ninety (90) days prior to January 31, 2003, LESSEE shall give written notice to LESSOR that it does not intend to renew this Lease for the additional five (5) year term. (emphasis added.)

Paragraphs 6(b) and (c) provided for two subsequent five-year renewals using the same language as paragraph 6(a), except that the amount of the fixed rent for each renewal is to be $275 greater than during the previous renewal term, and the base sales figure used to calculate the percentage rent is raised for each renewal.

Lessor's complaint here is that, by the use of the term "hereafter" in the judgment, the trial court rendered ineffective the provisions of paragraph 6 of the Lease relating to increased rent in the event of

renewal. It is not clear that this interpretation was the intent of the trial court in entering the judgment. For instance, the judgment stated that Lessee was "entitled to pay at the abated rent amount of $1,100 per month for loss of major anchor tenant [Consumers], *an amount equal to one-half (1/2) of the monthly fixed rent* in lieu of all other charges hereafter ..." (emphasis added.) Although the word "hereafter" was used, the judgment also stated that $1100 was one-half of the monthly fixed rent. This would be true during the primary term of the Lease, but not during any of the renewal periods, in that the fixed rent during those periods is to be increased pursuant to paragraph 6 of the Lease. Each of the subparagraphs of that paragraph provided for an automatic extension and renewal of the Lease "under the same terms and conditions *except*" for increased rent. Therefore, even if an abatement were appropriate during any of the renewal periods, one-half of the fixed amount of rent would be more than $1100 per month.

■ The interpretation of a contract is a question of law, and the cardinal rule is to ascertain the intention of the parties and to give effect to that intention. *Robbins v. McDonnell Douglas Corp.*, 27 S.W.3d 491, 496 (Mo.App. E.D.2000). Here, the Lease is clear in stating that, in the event of a renewal, the fixed rent is to be increased. One-half of that amount, in the event Lessee is entitled to an abatement, would be more than the $1100 declared by the trial court. Therefore, to the extent that the judgment purported to fix Lessee's liability for fixed rent at $1100, even during a renewal period, it was in error. To this extent, the judgment is reversed and the case is remanded with directions to the trial court to enter an amended judgment by deleting the word "hereafter" from the provision here under consideration.

■ Lessor's second point attacks the trial court's judgment to the extent that it found that the Inducement provision of the Lease was "clear and explicit," as well as "unambiguous." Lessor argues that the phrase "similar type and size" in the Inducement provision is ambiguous, and that the trial court departed from the rules of contract construction in deciding otherwise.

■ An ambiguity arises in a contract if there is duplicity, indistinctness, or uncertainty in the meaning of the words used, or if the contract promises something at one place and takes it away at another. *Bydalek v. Brines*, 29 S.W.3d 848, 854 (Mo.App. S.D.2000). The test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction, giving the words their plain and ordinary meaning as understood by a reasonable person. *Garner v. Hubbs*, 17 S.W.3d 922, 927 (Mo.App. S.D.2000). Whether a provision or term in a contract is ambiguous depends upon the context in which it is used. *Purcell Tire & Rubber v. Executive Beechcraft*, 59 S.W.3d 505, 510 (Mo. banc 2001). Accordingly, contract language is not interpreted in a vacuum, but by reference to the contract as a whole. *Id.* The mere fact that the parties disagree on the interpretation of a contract does not render the document itself ambiguous. *Garner* at 927.

■ Whether a contract is ambiguous is a question of law for the trial court to decide initially. *Fiegener v. Freeman–Oak Hill Health Sys.*, 996 S.W.2d 767, 772 (Mo. App. S.D.1999). That issue on appeal is also one of law and the standard of review is *de novo*, with the appellate court independently considering the evidence and reaching its own conclusions. *Id.*

The issue here revolves around the words "similar type and size business" found in the Inducement provision of the Lease. The phrase was used to refer to a business obtained to replace one of the major anchor tenants, in this case, Consumers. Lessor complains that the trial court construed that term to mean an *identical* business to Consumers. Lessor points out that "similar type" is not defined in the Lease and, therefore, it should be given its ordinary and usual meaning. *Uptergrove v. Housing Authority of City of Lawson,* 935 S.W.2d 649, 655 (Mo.App. W.D.1996). That meaning, according to Lessor, is found in WEBSTER'S UNIVERSAL COLLEGIATE DICTIONARY (1997), where "similar" is defined as "having a likeness or resemblance . . . in a general way." Lessor argues on the basis of this definition that "similar" clearly is something less than "identical," and that Sutherland's is similar to Consumers in that (1) they are both retail establishments; (2) they occupy the same space in the shopping center; (3) they both carry product lines that include flowers, plants, cleaning agents, and hardware; (4) they both advertise and bring people to the shopping center; and (5) they are similar in type because they are large retail sellers of consumer goods. Moreover, Lessor argues, since "similar" has no definite meaning in the dictionary and requires some construction external to the contract, and the words "similar type business" requires even more interpretation, the phrase is "patently ambiguous."

In response, Lessee notes that WEBSTER DICTIONARY NEW EDITION (1972) defines "similar" as "somewhat like, resembling" and defines "type" as "an exemplar, pattern." Accordingly, it contends that a hardware store does not resemble or pattern a grocery store, and that the evidence was, therefore, sufficient to support the trial court's findings that Sutherland's and Consumers were not similar type businesses.

The phrase "similar type and size business" is obviously susceptible to honest differences in interpretation, and is indistinct and uncertain as to its application. While it is clear that "similar" means something less than identical, there is no guidance provided in the Lease concerning how "similar" another business must be to qualify as an acceptable replacement for a named major anchor tenant that vacates the shopping center. Likewise, the Lease is unclear regarding the intended qualifying characteristics that must be used to judge the required similarity. For instance, does a "similar type" business refer to the types of goods offered for sale and, if so, how "similar" must they be? Also, does "similar . . . size business" refer to the square footage occupied by the replacement business, or does it refer to the amount of its sales?

In *CIT Group/Sales Fin. Inc. v. Lark,* 906 S.W.2d 865, 868 (Mo.App. E.D.1995), the court said that "[a] contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." Here, the phrase in question yields more than a single meaning, and reasonable people may fairly differ in their construction of it. As a consequence, it is ambiguous. The trial court's conclusion to the contrary was an erroneous declaration and application of the law.

Where an ambiguity exists, "the cardinal principle is to determine the intent of the parties." *Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991). In order to do that, "a court will consider the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding

the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties." *Id.*

Lessee's store in the shopping center sells "[p]opular priced ladies' apparel." According to the only testimony on the subject, Lessee wants to be in shopping centers that have grocery stores and discount or major department stores because those types of businesses attract female shoppers. Lessee's leasing agent, who was responsible for leasing the premises involved here, testified that Consumers and Wal–Mart provided the traffic they had to have in this shopping center. He also said that what persuaded Lessee to lease the premises was the amount of customer traffic generated by Consumers and Wal–Mart.

In considering the entire Lease, it is apparent that the parties recognized the importance of having businesses in the shopping center that attracted shoppers. Thus, provisions in the Lease demonstrated the significance the parties placed on having the premises substantially full by providing a reduction in rent if it was less than 80% occupied. They also demonstrated the significance of having major anchor tenants occupying the premises by providing an opportunity for Lessee to cancel the Lease if a major anchor tenant vacated and Lessor did not, within six months, replace it with another anchor tenant "operating a similar type and size business" and, in the interval, providing for a reduction in rent.

The importance of having tenants in the shopping center that would draw the types of customers Lessee considered necessary for its business is also highlighted by the fact that the Inducement provision was included in the Lease. According to the testimony, Lessee insisted that such a provision be included and that it specifically refer to Consumers and Wal–Mart as the major anchor tenants. In fact, Lessor's leasing agent agreed that the parties intended the major anchor tenants to be Wal–Mart and Consumers, and no others. It is clear from the record that the reason for this requirement was to provide the type of customer traffic in the shopping center necessary for Lessee's type of store.

Given these considerations surrounding the execution of the Lease, it is apparent from the record that Sutherland's does not qualify as a "similar type" business to Consumers. Sutherland's is a home improvement store, while Consumers was a grocery store. Lessee's leasing agent testified that women go to a grocery store at least two times a week, and that, on the day of trial, he had observed nine customers in Sutherland's and that only one was a woman. Accordingly, he testified that Sutherland's was not a similar type business as Consumers.

Lessor's evidence concerning the comparison between Sutherland's and Consumers included the testimony of its leasing agent who handled the lease to Lessee. When asked about the similarities between the two, he said that "they're similar to a point where they're both retail tenants[,] ... they bring people in the center ... [and] they advertise." He also said that Sutherland's took all of Consumers' space in the shopping center, and when asked if they sold some of the same products, he said that he didn't know what Consumers' product line was, but "would assume that they would have a hardware line." Later, he said that the two were similar in "certain ways" in that they were a "similar tenant" in "[w]hat they do for the center, people that they bring in, sales, et cetera."

Another of Lessor's witnesses who had worked for its leasing agent, testified that Sutherland's and Consumers were similar "[t]o a degree" in that Consumers is a retail establishment that carries some products similar to those of Sutherland's, although their main products are different. She said that they both sold cleaning agents and floral products, and that Consumers also had a "small hardware area."

In summary, it is apparent from the testimony that there are significant differences between Consumers and Sutherland's when gauged against the reasons the parties agreed to the provisions in this Lease concerning such things as a minimum occupancy rate of the shopping center, and the identity of major anchor tenants, i.e., Lessee's need for a high volume of female shoppers.

■■■■■ "Where a contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally make, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable contract." *Rouggly v. Whitman*, 592 S.W.2d 516, 521 (Mo.App. E.D.1979) (quoting *Miller v. Kamo Electric Coop.*, 351 S.W.2d 38, 42 (Mo.App.K.C.1961)). "The more probable and reasonable of two available constructions should be utilized to the exclusion of one which produces a 'redundant, illusory, absurd, and therefore unreasonable' result." *Rouggly* at 521. Here, the more probable and reasonable construction of the Inducement provision in the Lease is that Sutherland's is not a tenant meeting the "similar size and type business" criteria in that its type of business is not as likely to attract the numbers and gender of customers to the shopping center as would Consumers.

■■■■ Lessor argues that since the Inducement provision was ambiguous, it should be construed against Lessee as the drafter of that language, citing such cases as *Graue v. Missouri Property Ins. Placement Facility*, 847 S.W.2d 779, 785 (Mo. banc 1993). Although the evidence was less than clear on the subject, it appeared to indicate that Lessee was responsible for the language contained in the Inducement provision of the Lease. However, the rule espoused by Lessor is employed only as a last result, when there is no evidence showing the parties' intent. *Graham v. Goodman*, 850 S.W.2d 351, 356 (Mo. banc 1993). In *Rouggly*, the court said:

> [T]he rule of construction requiring that ambiguous language be construed against the party responsible for its use is based more on a concept of appropriate allocation of blame for the faulty language than on an attempt to ascertain true intent or meaning. Consequently, this rule is employed only as a last resort when other available data bearing on the agreement shed no light on actual intent or meaning.

592 S.W.2d at 523. Here, there is no need to resort to such an artificial rule of construction. The evidence recited above concerning the circumstances surrounding this Lease, together with its other provisions, lead us to the conclusion that Sutherland's is not a "similar type and size business" as Consumers within the intent and meaning of the language in the Inducement provision.

Lessor also argues that the Inducement paragraph is exculpatory because of Lessee's contention that it is entitled to an abatement of one-half of the monthly rent until Consumers is replaced with a similar type and size business. Accordingly, it cites *Howe v. ALD Services, Inc.*, 941

S.W.2d 645 (Mo.App. E.D.1997), for the proposition that an exculpatory clause that purports to decrease the obligations of a party to a lease will be construed strictly against that party. *Howe,* however, discusses that principle only in the context of a lease that would relieve the landlord of liability for the condition, maintenance, or repair of the leased premises. *Id.* at 650. The authority the *Howe* court cites for that premise also relates to the same subject. *See Mobil Oil Credit Corp. v. DST Realty, Inc.,* 689 S.W.2d 658, 661 (Mo.App. W.D.1985) (citing *Restatement (Second), of Property* ( Landlord and Tenant) Section 5.6). Since the Inducement provision of the Lease here does not purport to decrease Lessor's obligation with regard to the condition of the Leased premises, *Howe* provides no support for its contention under this point.

Lessor also argues that the Inducement paragraph only provides for abatement of rent while the anchor tenant property is physically vacant, and that a new tenant's lack of similarity to Consumers only gives a right to cancel the lease. Its argument proceeds on the premise that the "similar type and size business" language appears only in that portion of the Inducement provision that deals with an option Lessee may exercise to cancel the lease upon a major anchor tenant vacating the shopping center. Accordingly, Lessor argues that, because Lessee chose not to cancel the Lease upon Consumers' departure, it lost any right to insist on a new tenant meeting the "similar type and size business" language.

We disagree with this premise. It is true that the Inducement provision says that Lessee has the option to cancel the lease if a major anchor tenant vacates the shopping center, but that it cannot exercise that option until Lessor has had six months to obtain another tenant operating a "similar type and size business" as that of the vacating tenant. The same paragraph proceeds, however, to say that "[d]uring the period of such major anchor tenant's vacancy," Lessee may, in lieu of all other rent and charges under the lease, pay one-half of the monthly fixed rent that would otherwise be due under the Lease. It appears clear to us that the reasonable construction of this paragraph is that the major anchor tenants vacancy, which would authorize the payment of one-half of the fixed rent in lieu of all other charges, includes any periods during which the vacated major anchor tenant is replaced with another tenant not operating a "similar type and size business." [2] Point two is denied.

In its third point, Lessor contends that the trial court erred in construing the Inducement provision against it and in favor of Lessee because that clause, "properly construed, permits [Lessor] to replace the vacating tenant, Consumers, with a new tenant, Sutherlands, but does not entitle [Lessee] to a continued rent abatement of one-half rents after Sutherlands occupies the space, in that [Lessee's] option to abate to one-half rents only applies while the major anchor tenant space is vacant and, once it is occupied by Sutherlands, [Lessee] was no longer entitled to abate to half-rents." This contention is virtually

**2.** We note that the Inducement paragraph, in discussing abatement of rent, refers to the "monthly fixed rent that would otherwise be due under this Lease." As indicated in our discussion of Lessor's first point, the Lease provides for the automatic renewal of its terms at increased rent if Lessee fails to give notice of its intention not to renew. Rent that would otherwise be due under the renewals of the Lease would be the increased amounts called for with regard to each such renewal.

identical to Lessor's last argument under the preceeding point.

In support of this point, Lessor points out that the sentence in the Inducement provision of the Lease dealing with abatement of rent says that "[d]uring the period of such major anchor tenant's vacancy," Lessee may abate monthly fixed rent and other charges, and in lieu thereof pay Lessor "an amount equal to one-half (1/2) of the monthly fixed rent that would otherwise be due under this lease." Lessor highlights the fact that this sentence applies "[d]uring the period of" the vacancy of the space previously occupied by the anchor tenant, and argues that the failure to substitute a similar type and size business for the vacating tenant only gives Lessee the right to cancel the lease. According to Lessor, Consumers' vacancy expired once Sutherland's began occupying the space, as did Lessee's opportunity to abate to half-rents. In summary, Lessor argues that the "period of such major anchor tenant's vacancy" provision in the Inducement provision giving Lessee the right to abate rent only applies until any new tenant occupies the Consumers' space.

The portion of the Inducement provision specifically referring to abatement of rent is prefaced by the words, "[d]uring the period of such major anchor tenant's vacancy." Lessor interprets this to mean that as long as the major anchor tenant's space is unoccupied by anyone. Lessee, on the other hand, interprets it to mean that the major anchor tenant's vacancy continues until Lessor finds another tenant operating a "similar type and size business." We agree with Lessee. The provision does not say "during the period" the *space* previously occupied by such major anchor tenant is vacant. Rather, it refers to "such major anchor tenant's vacancy," which clearly refers to the identity of the tenant. The preceding portions of the In-

ducement provision refers to identified major anchor tenants, and to acceptable replacements, which are described as businesses "operating a similar type and size business as that of such vacating tenant." This, taken with our earlier discussion relating to the obvious importance attached by the parties to major anchor tenants attracting high volumes of certain types of customer traffic, makes it unreasonable to interpret this phrase as argued by Lessor. Instead, we conclude that it is more reasonable, and consistent with the expressed intent of the parties, to interpret the phrase to mean that, upon a vacancy by a major anchor tenant, the rent is abated as described in the Inducement provision until a replacement meeting the "similar type and size business" requirement is obtained. Point three is denied.

 Lessor's fourth point on appeal contends that the trial court's finding that a "hardware store" is not a "similar type" business as a "grocery store," and "does not 'attract the same clientele for shopping,' " was against the weight of the evidence because the trial court refused Lessee's evidence concerning traffic patterns at the shopping center. We disagree.

The thrust of Lessor's argument under this point is that, since Lessee was not permitted to introduce evidence concerning traffic patterns at the shopping center or national studies and statistics on that issue, the court's finding regarding the lack of similarity of a hardware store to a grocery store is not supported by any evidence. In fact, Lessee's evidence did include testimony that it needed the traffic generated by businesses like the major anchor tenants identified in the Lease (grocery stores and discount stores) because they bring in the female shoppers it needs for its business. As indicated earlier, there was testimony about the importance of female customers to Lessee's

business, the number of times women go to a grocery store each week, and that the premises were leased after the customer traffic in Consumers had been observed. Such testimony was based on personal observations by the witness and information gained from a national trade organization. There also was evidence that a witness had recently observed the Sutherland's store in question, finding that there were seven cars in the parking lot, with nine people in the store, only one of whom was a woman. Finally, there was evidence that Lessee would not have entered into the Lease without the Inducement provision and the identification of Consumers and Wal–Mart as major anchor tenants.

▆▆▆▆ In reviewing a court-tried case, an appellate court should exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and a firm belief that it was wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "Weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. *Rhodes v. Blair*, 919 S.W.2d 561, 564 (Mo.App. S.D.1996). In a review to determine if the judgment is against the weight of the evidence we realize that the trial court is in a much better position than are we to judge the credibility of the witnesses and to determine the weight to be given to their testimony. *King v. King*, 793 S.W.2d 200, 202 (Mo.App. W.D.1990). Thus, we give the prevailing party the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, disregarding all evidence to the contrary. *Id.* Based on this standard of review, we are unable to say that the findings of the trial court complained of in this point were against the weight of the evidence. Point four is denied.

In its fifth and final point, Lessor contends that the trial court erred in considering the testimony of Lessee's leasing agent that a home improvement store would not draw as strongly for a women's clothing store as would a grocery store because that testimony was not based on facts reasonably relied upon by experts in the field and shown to be reasonably reliable. Lessor argues that the witness did not establish his experience with demographics or a statistical database for Ozark, Missouri and the surrounding area, and because the testimony called for speculation. Lessor points out that the trial court had previously refused to allow the witness to testify about national averages and studies, and the witness's prior testimony did not suggest that he had experience with the traffic studies and demographics of shopping centers in Ozark, Missouri.

Specifically, Lessor points to a question posed to the witness asking whether, in his experience, a home improvement store would draw as strongly for a women's apparel store as would a grocery store. Lessor's objection, which was overruled, was "[l]ack of foundation. Calls for speculation." The witness then testified about his visit to the Sutherland's store referred to earlier, and that women go to the grocery store at least two times per week.[3]

▆▆▆ Our courts have held on numerous occasions that an objection for "lack of foundation" is a general objection and is not sufficiently specific to preserve the issue for appellate review. *Nagel v. Bi–State Development Agency*, 567 S.W.2d 644, 646 (Mo. banc 1978); *Carter v. St. John's Regional Medical Center*, 88

---

**3.** Although the answer was not responsive to the question, there was no objection on that basis.

S.W.3d 1 (Mo.App. S.D.2002). This is because it fails to apprise the trial court of the specific foundational element considered deficient. *Barish v. Director of Revenue*, 872 S.W.2d 167, 175 (Mo.App. W.D. 1994). "Where the objection is that an inadequate foundation has been laid it is 'particularly important' that the objection made be specific because foundation deficiencies can frequently be remedied." *State v. Brown*, 949 S.W.2d 639, 642 (Mo. App. E.D.1997). The same is true of an objection that the question calls for speculation where, as here, the real basis is failure to lay a foundation. *Id.*

Assuming, arguendo, that the objection was sufficient to preserve this point for our review, and was incorrectly overruled, the erroneous admission of evidence is "scarcely ever" grounds for reversal in a court-tried case. *Wilson v. Sullivan*, 922 S.W.2d 835, 838 (Mo.App. E.D.1996). The reason is that the trial court can presumably sort out the incompetent and the irrelevant, and base its decision on the competent and the relevant. *Id.* This is true except where it appears from the record that the court relied on the evidence and that no other competent evidence supports the judgment. *Randall v. Eldridge*, 856 S.W.2d 381, 382 (Mo.App. E.D.1993).

Here, Lessor argues that the trial court apparently relied on the testimony in question in finding that Sutherland's and Consumers are not similar type businesses in the fair and ordinary sense of their operations. To the contrary, the same witness testified, without objection, that (1) female shoppers are more important to Lessee's business than male shoppers; (2) Lessee has to have the foot traffic generated by grocery stores and discount stores since they bring female shoppers to shopping centers; (3) Wal–Mart and Consumers provide the traffic it needs in a shopping center; and (4) Lessee was led to this location by his observation of the traffic going into Consumers. Additionally, the record includes the testimony of Lessor's witnesses that (1) Consumers and Sutherland's are "similar to a point," and to "a degree"; (2) Sutherland's isn't really a market, it is a home improvement store, and they are different in that respect; and (3) the parties intended that the major anchor tenants would be Wal–Mart and Consumers to the exclusion of all others. The record contains sufficient and competent evidence to support the trial court's findings. Point five is denied.

The judgment is reversed and remanded to the trial court with directions, consistent with this opinion, to enter an amended judgment deleting the word "hereafter" in declaring Lessee's obligation to pay fixed rent. Otherwise, the judgment is affirmed.

MONTGOMERY, P.J., and BARNEY, J., concur.

## ON MOTION FOR REHEARING AND MOTION FOR TRANSFER

PER CURIAM.

Lessor filed a "Motion For Rehearing Or, In The Alternative, For Transfer To The Missouri Supreme Court." In that motion, Lessor contends, inter alia, that, although we correctly determined that the term "similar type and size business" in the Inducement paragraph of the Lease was ambiguous, we proceeded to weigh and determine the credibility of the evidence when that function should only be performed by the trial court. Lessor argues that the case should have been remanded to the trial court for that purpose and, in support, cites cases such as *Specialty Restaurants Corp. v. Gaebler*, 956 S.W.2d 391 (Mo.App. W.D.1997), and *Baker v. Whitaker*, 887 S.W.2d 664 (Mo.App. W.D.1994). In *Specialty Restaurants*, the

court remanded the case to the trial court, saying that while the trial court had received evidence regarding the parties' intent, it presumably had not considered it because of its conclusion that the document in question was "clear and unambiguous." *Id.* at 394. On remand, the trial court was directed to glean the parties' intent from the extrinsic evidence in the record. *Id.* at 395–96. In *Baker,* the trial court apparently made no determination about the meaning of the phrase found to be ambiguous, and on remand was directed to do so. *Id.* 670–71.

In the instant case, the trial court made findings relating to the intent of the parties, in addition to its finding that the contract was "an integrated unambiguous written contract." The trial court, in its Findings of Fact said:

6. It is unlikely [Lessee] would have executed the lease and located its ladies apparel store in a shopping center anchored by a hardware store so that [Lessor's] interpretation of [the Inducement paragraph] is unusual, inequitable and unlikely.

7. [Sutherland's] and [Consumers] are not similar type businesses in the fair and ordinary sense of their operations, one being a hardware store and the other a grocery store, so that [Sutherland's] is not a suitable replacement tenant for [Consumers].

Contrary to *Specialty Restaurants* and *Baker,* the trial court in this case obviously considered, and made findings concerning, the evidence of what was the intent of the parties in entering into the Lease, and particularly the Inducement paragraph thereof. Lessor's interpretation of the Inducement paragraph, set out in our opinion, was found by the trial court to be "unusual, inequitable and unlikely." This finding was made after hearing the evidence presented by the parties, including the evidence that a court is to consider in determining the intent of the parties after an ambiguity is found in a document. Those factors are set out in *Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991), cited in our opinion. Even though the trial court found that the Lease was unambiguous, it also made findings concerning the factors that are to be considered in determining the intent of the parties when a document is found to be ambiguous.

In *Rouggly v. Whitman,* 592 S.W.2d 516 (Mo.App. E.D.1979), cited in our opinion, the court considered the evidence that had been before the trial court in a case where, as here, the trial court had improperly concluded that a document was unambiguous. There, unlike this case, the conclusion that the document was unambiguous had apparently resulted in no findings relating to factual issues. Nevertheless, the court said that "we will review the entire record of the proceedings below, and, if the evidence is sufficient to enable us to do so, enter such judgment as should have been entered below." *Id.* at 519. As in *Royal Banks,* the court in *Rouggly* said that in construing ambiguous contracts, the courts consider "the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances which cast light on the intent of the parties." 592 S.W.2d at 519–20. The court also said that "[t]he more probable and reasonable of two available constructions should be utilized to the exclusion of one which produces a 'redundant, illusory, absurd, and therefore unreasonable' result." *Id.* at 521 (internal citations omitted). After doing so, the court in *Rouggly*

concluded, as we have here, that there was no need to resort to the artificial rule of construction whereby courts construe ambiguous language against the party responsible for its use. *Id.* at 523. Accordingly, this argument in Lessor's motion is not well taken.

Lessor also states that we "overlooked facts in finding that the 'only testimony' on the subject of the parties [sic] intent were the declarations of lessee or its agent," because Mrs. Rathbun testified extensively about her understanding of the meaning of the lease terms. Lessor misinterprets our opinion. In our discussion of Lessor's second point on appeal, we said that "[a]ccording to the only testimony on the subject, Lessee wants to be in shopping centers that have grocery stores and discount or major department stores because those types of businesses attract female shoppers." In that statement, we were alluding to the evidence concerning Lessee's criteria and intent in selecting sites for its businesses. We did not purport to say, as Lessor suggests, that there was no other evidence concerning the intent of the parties concerning the terms of the Lease. In fact, as we said in our opinion, Lessor's agent agreed that the intent of the parties was that Wal–Mart and Consumers were to be the major anchor tenants and no others.

One other matter raised by Lessor in its motion deserves discussion. This relates to the trial court's finding that the Lease is an integrated "unambiguous" written contract. Lessor points out that in our opinion, we concluded that the phrase "similar type and size business" is ambiguous, but that we remanded the case to the trial court to correct its judgment only to the extent that it used the term "hereafter" in describing the rent obligations under the Lease. Lessor's argument that we should not permit the judgment to stand

with a finding that the Lease is unambiguous when we have found that a part of it is, in fact, ambiguous, is well taken. On remand, the trial court is directed to delete its finding that the Lease is unambiguous, and, in addition to deleting the term "hereafter" discussed in the opinion, to enter a judgment consistent with this opinion and this addendum.

Other issues raised in Lessor's motion require no further discussion. Except as described above, the motion is denied.