**MONSANTO COMPANY, Respondent,**

v.

**SYNGENTA SEEDS, INC., Appellant.**

**No. ED 87783.**

Missouri Court of Appeals,
Eastern District,
Division Five.

June 12, 2007.

Gretchen Garrison, St. Louis, MO, for appellant.

Mark G. Arnold, Clayton, MO, for respondent.

PATRICIA L. COHEN, Judge.

Syngenta Seeds, Inc. ("Syngenta")[1] appeals from the trial court's judgment declaring that Syngenta has the right to sell only a single brand of soybean seed, specifically the "NK" brand, pursuant to the express terms of an Agreement between Syngenta and Monsanto Company ("Monsanto"). We reverse and remand.

### Facts and Procedural History

Syngenta, an international seed company, entered into a license agreement with Monsanto on January 11, 1993 (the "Agreement"). The Agreement provided that in exchange for a one-time payment of $450,000 to Monsanto,[2] Monsanto would grant Syngenta certain rights in its glyphosate herbicide technology to "conduct further research work in the licensed field and to produce and sell soybean seed exhibiting such herbicide tolerance." Specif-

---

1. Syngenta was formed after a merger between Ciba–Geigy Corporation and Northrup King, also known as Sandoz Seeds, in 1996. Syngenta is the successor-in-interest to the rights under the license agreement. For the purposes of this appeal, we will use Syngenta rather than Ciba–Geigy, which is the company referenced in the Agreement.

2. The parties refer to this payment arrangement as a "paid-up" license or a non-royalty based license agreement.

ically, Section 3.1 of the Agreement provided as follows:

> MONSANTO [3] hereby grants to CIBA–GEIGY ... and CIBA–GEIGY ... hereby accept[s], on and subject to the terms and conditions of this Agreement, a non-exclusive, nontransferable (except as expressly set forth herein) LICENSE ... to develop, produce, have produced and sell LICENSED COMMERCIAL SEED in THE TERRITORY subject to the provisions of paragraphs 3.2, 3.3, 3.4 and 3.5 hereof and without the right to sublicense except as expressly set forth herein.

The Agreement defined the phrase "licensed commercial seed" as: *"CIBA–GEIGY brand seed* of the LICENSED PLANT SPECIES which incorporates THE GENE supplied by MONSANTO." (emphasis added). The Agreement defined "CIBA–GEIGY" to mean the Ciba–Geigy corporation and the phrase "LICENSED PLANT SPECIES" as soybeans.[4] According to the record, the parties knew that, due to continuing research and regulatory approval, the seed would be available for commercial sale no earlier than 1995 and indeed the seed was not available for commercial sale until Spring 1997. At the time the parties entered into the Agreement, Ciba–Geigy used "Ciba Seeds" as the sole brand name for its products.[5]

In 1996, Ciba–Geigy merged with another seed company forming Syngenta Seeds, Inc. Syngenta executives determined that, although Syngenta owned multiple trademarked brands as a result of the merger, the company would market all of its field crop products under the "NK" brand. According to Syngenta, the company made this decision independent of the Agreement as the licensed seed was not yet available to sell. In 1997, the licensed soybean seed became available and Syngenta began marketing it under the "NK" brand. Monsanto did not object to Syngenta using the "NK" brand instead of the "Ciba Seeds" brand.

The seed market changed significantly in the years following 1997. In that time, Monsanto acquired several seed companies of its own, becoming a leading seed company and major competitor of Syngenta. As a result of mergers and further contract negotiations, Syngenta is the only remaining seed company authorized to sell the seed without paying a per package royalty to Monsanto.

Pursuant to the Agreement, on January 6, 2003, Syngenta sent Monsanto a letter informing Monsanto of its introduction of new varieties of licensed seed and its intention to introduce a new Syngenta brand of the licensed seed called "Independence."[6] On May 10, 2004, Monsanto filed a Petition for Declaratory Judgment and Injunctive Relief seeking a declaration that the Agreement, specifically section 2.1.4 and the phrase "CIBA–GEIGY brand seed," only allowed Syngenta to market

---

**3.** The capitalized words are defined terms set forth in Section 2 of the license agreement.

**4.** According to the record, this variety of soybean seed is tolerant to glyphosate which can be sprayed over entire fields without destroying the soybean crop, but rather just the weeds. Monsanto's glyphosate herbicide is widely known as "Roundup" or "Roundup–Ready."

**5.** The record reveals that Ciba–Geigy had at least one other brand just one year prior to entering into negotiations with Monsanto, called "Funks G."

**6.** Pursuant to the license agreement, before marketing a new variety of the licensed soybean seed, Syngenta was required to disclose to Monsanto certain data to demonstrate that such variety exhibited tolerance to the glyphosate, or "Roundup."

the licensed seed under the single "NK" brand.[7] Shortly after Monsanto filed its Petition for Declaratory Judgment, Syngenta filed a motion for summary judgment. The trial court held a two-day hearing and, in an order dated May 25, 2005, denied Syngenta's motion.

At trial, the parties did not offer any parol evidence, agreeing with the trial court's initial determination that the Agreement, and specifically "CIBA–GEIGY brand seed," lacked ambiguity.[8] Following a two-day trial, the trial court granted Monsanto's Petition for Declaratory Judgment. In its Findings of Fact and Conclusions of Law, the trial court found that: (1) the Agreement and the phrase "CIBA–GEIGY brand seed" were clear and unambiguous; and (2) "by referring to the word 'brand' in the singular ... the Agreement only permits and expressly limits Syngenta to selling only a single brand of Roundup Ready soybean seed." Syngenta appeals.

### Standard of Review

Our review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). In a court-tried case, we will sustain a trial court's judgment unless: (1) there is no substantial evidence to support it; (2) it is against the weight of the evidence; (3) it erroneously declares the law; or (4) it erroneously applies the law. *Id.* at 32. Although this Court accords considerable deference to judgments turning on evidentiary and factual evaluations, "no such deferential consideration obtains in cases decided upon erroneous declarations or applications of law." *Rouggly v. Whitman*, 592 S.W.2d 516, 519 (Mo.App. E.D. 1979). "While we defer to the trial court's factual finding, we independently evaluate its conclusions of law." *Rathbun v. Cato Corp.*, 93 S.W.3d 771, 777 (Mo. App. S.D.2002). Contract interpretation and questions of contractual ambiguity are issues of law, which we review *de novo* on appeal. *Executive Bd. of Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437, 447 (Mo.App. W.D.2005).

### Discussion

Syngenta raises three points on appeal. In Syngenta's first two points, it claims the trial court erred in its construction of the contract.[9] In its third point, Syngenta argues the trial court erred in permanently enjoining and prohibiting Syngenta from using "any brand other than the single 'NK' brand."

■ "License agreements are purely contractual in nature." *Republic Eng'g & Mfg. Co.*, 376 S.W.2d 649, 654 (Mo.App. E.D.1964). "The usual principles of con-

---

7. It is unclear from the record what transpired between the parties between the time of the January 2003 letter and Monsanto's filing of its petition in May 2004. As of the time of trial, Syngenta had not sold any packages of seed under the "Independence" brand. Syngenta argues that Monsanto filed the petition and objected to its use of the "Independence" brand because Syngenta acquired two seed companies that had royalty-bearing license agreements with Monsanto.

8. The parties did, however, offer extensive extrinsic evidence, both at the summary judgment hearing and the trial, as discussed below.

9. Specifically, in Syngenta's first point, it asserts that the trial court erred in interpreting the contract, because the trial court isolated the word "brand" and failed to examine the term in light of the license agreement as a whole. In its second point, Syngenta contends that, by holding the license agreement restricts Syngenta to selling only one brand, the trial court erred by inserting a negative covenant in a license agreement that restricts certain areas but does not mention a single brand restriction.

tract law govern the construction of such agreements." *Id.* The interpretation and construction of the contract are questions of law, which the appellate court reviews *de novo* without deference to a trial court's construction. *Lee v. Bass*, 215 S.W.3d 283, 288 (Mo.App. W.D.2007). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). We read the terms of a contract as a whole to determine the intention of the parties and we give the terms their plain, ordinary and usual meaning. *Id.* We construe each term of a contract to avoid rendering other terms meaningless. *Id.* Further, a "construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id.*

Where two reasonable constructions of a contract exist, it is ambiguous. *Spirtas Co. v. Div. of Design & Constr.*, 131 S.W.3d 411, 416 (Mo.App. W.D.2004). "An ambiguity arises in a contract if there is duplicity, indistinctness, or uncertainty in the meaning of the words used, or if the contract promises something at one place and takes it away at another." *Rathbun*, 93 S.W.3d at 778. "The test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction." *Id.* If an ambiguity exists, the trier of fact, using extrinsic evidence, resolves the ambiguity. *Boyer v. Sinclair & Rush, Inc.*, 67 S.W.3d 627, 631 (Mo.App. E.D.2002).

An examination of the entire Agreement reveals little regarding the parties' intent with respect to the term "brand" or the phrase "CIBA–GEIGY brand seed." The Agreement does not define the term "brand" and uses it only twice. First,

Section 2.1.4 defines "Licensed Commercial Seed" to mean "CIBA–GEIGY brand seed." Second, Section 4.10 provides, in pertinent part:

> Both parties desire to cooperate during the term of this Agreement ... while recognizing that Monsanto has sole responsibility to develop and execute the marketing and promotional efforts for its *brand* of Glyphosate product and Ciba–Geigy has sole responsibility to develop and execute the marketing and promotional efforts for its *brand* of Licensed Commercial Seed.

(emphasis added). Although both section 2.1.4 and 4.10 employ the term "brand," the Agreement provides no further clarification as to the term's meaning or legal effect. By contrast, the document uses the word "branded"—as in, "Monsanto branded glyphosate" and "CIBA–GEIGY branded seed"—six times and it appears that the parties do not dispute that the term "branded" encompasses multiple brands.

Monsanto argues that because: (1) the term "brand" is used in the singular in Section 2.1.4, the parties intended to limit Syngenta to the use of one brand to market the licensed seed; and (2) Syngenta used only one bran—the "NK" brand to market the licensed seed, Syngenta's "course of performance" establishes that Syngenta construed the Agreement to permit the use of only one brand. Additionally, Monsanto asserts that Section 4.10 has no bearing on the interpretation of Section 2.1.4 and that the term "CIBA–GEIGY brand seed" means "Ciba Seeds."

In construing a contract—and in determining whether or not an ambiguity exists—we consider the entire instrument. *Rouggly*, 592 S.W.2d at 519. Here, Monsanto asks this Court to find the word "brand" operates differently depending upon the particular section of the Agree-

ment. Thus, Monsanto asserts that "CIBA–GEIGY brand seed" means "Ciba Seeds," even though Syngenta never sold the licensed seed as "Ciba Seeds." While Monsanto argues that section 4.10's use of the singular word "brand" is consistent with Monsanto's construction of section 2.10, because Monsanto intended to sell only a single brand of glyphosate, the record does not support this contention.[10] Rather, the evidence supports the conclusion that Monsanto had multiple glyphosate brands and thus, intended to market all of them.[11] Additionally, the record reveals that the parties understood the phrase "Monsanto branded glyphosate" to mean any glyphosate brand marketed by Monsanto.[12]

Syngenta, on the other hand, argues that the Agreement's use of "CIBA–GEIGY brand seed" means "company brand seed," i.e., any trademarked brand name in use by Syngenta, and therefore does not operate to restrict the number of brands Syngenta may employ. In support of its argument, Syngenta notes that while the "CIBA–GEIGY brand seed" was "Ciba Seeds" at the time the parties executed the Agreement, Syngenta eventually marketed the licensed seed, without Monsanto's objection, under the "NK" brand. Syngenta also points out that, at the time the parties entered into the Agreement, the parties neither contemplated a merger of Ciba–Geigy nor the use of the "NK" brand. Finally, Syngenta argues that the word "brand" does not operate to restrict quantity, but is simply used—as in section 4.10—to mean any brand owned by the company.

■ From our review of the record, we conclude that the phrase "CIBA–GEIGY brand seed" is "reasonably susceptible of different constructions." *See Rathbun,* 93 S.W.3d at 778. Although the word "brand" is used in the singular form, it is unclear whether the parties intended a quantity restriction, as Monsanto contends, especially when the parties admittedly intended section 4.10's use of the term "brand," again, in the singular, to include multiple quantities. In the context of the Agreement, "CIBA–GEIGY brand seed" permits more than a single meaning and reasonable people may fairly differ in their construction of it. As a result, we find the phrase "CIBA–GEIGY brand seed" was ambiguous and the trial court's conclusion to the contrary was an erroneous declaration and application of law.

■ Notwithstanding its finding that the Agreement and the phrase "CIBA–GEIGY brand seed" was unambiguous, the trial court, admitted and apparently considered, some extrinsic evidence of the parties' intent. As the parties agree, where the court determines that a relevant term, phrase, or the contract as a whole is unambiguous, some extrinsic evidence may be used to interpret rather than to con-

---

10. At trial, it appears that Monsanto conceded that "Monsanto brand glyphosate" in Section 4.10 means Monsanto's multiple brands. The evidence at trial showed that Monsanto had multiple designations for its glyphosate. However, its argument at trial was that the Agreement should not be construed to restrict Monsanto's use of its technology when the purpose of the Agreement was to restrict Syngenta's use and marketing of the licensed seed.

11. This Court notes that the Agreement does not indicate a specific Monsanto brand of glyphosate.

12. Monsanto required its licensed users, including Syngenta, to require their customers to only use Monsanto brand glyphosate on the licensed seed. Monsanto informs its licensed users what glyphosate brands are currently available for their customers to use.

strue a contract term.[13] *Phipps v. School Dist. of Kansas City*, 645 S.W.2d 91, 100 (Mo.App. W.D.1982) (adopting section 202 of the Restatement (Second) of Contracts). Nevertheless, as we held in *Burrus v. HBE Corp.*, "a court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language." 211 S.W.3d 613, 617 (Mo.App. E.D.2006). Here, the ambiguity of the phrase "CIBA–GEIGY brand seed" renders construction with reference to extrinsic and/or parol evidence necessary rather than simply an interpretation gathered from the Agreement alone. By declaring the Agreement unambiguous and thereby limiting the inquiry to the intent of the parties as gathered from the Agreement alone, the trial court erred. Accordingly, we reverse the trial court's judgment and remand for the trial court to construe the meaning of the ambiguous phrase "CIBA–GEIGY brand seed" through extrinsic and/or parol evidence.

### Conclusion

The judgment of the trial court is reversed and remanded.

BOOKER T. SHAW, C.J. and SHERRI B. SULLIVAN, J., Concur.

---

13. As both § 202 of the Restatement and *Phipps* explain, the act of interpreting a contractual term is limited to defining its meaning. Construction of a contractual term refers to a determination of the legal effect of a term. *Phipps*, 645 S.W.2d at 100; *see* 5 Corbin on Contracts § 24.3 ("In accordance with this distinction, the construction of a contract begins with the interpretation of its language but does not end with it, while the process of interpretation stops wholly short of a determination of the legal relationships of the parties.")