**Richard J. STAHLHUTH and Sally J. Irwin, In their Individual Capacities and as Trustee of Special Trust a f/b/o Richard J. Stahlhuth of the Virginia Hunter Grantor Retained Income Trust Dated 7/25/89 and Trustee of Special Trust a f/b/o Sally J. Irwin of the Virginia Hunter Grantor Retained Income Trust Dated 7/25/89, Plaintiffs/Respondents,**

v.

**SSM HEALTHCARE OF ST. LOUIS, Defendant/Appellant.**

**No. ED 91990.**

Missouri Court of Appeals, Eastern District, Division Four.

April 28, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 2009.

Application for Transfer Denied Sept. 1, 2009.

Kevin Francis Hormuth, Greensfelder, Hemker & Gale, P.C., St. Louis, MO, for Appellant.

Michael Morgan Godsy, Sonnenschein, Nath & Rosenthal, St. Louis, MO, for Respondent.

## OPINION

MARY K. HOFF, Judge.

SSM Healthcare St. Louis (SSM) appeals from the trial court's Amended, Corrected, and Modified Order and Judgment (Amended Judgment) entered in favor of Richard J. Stahlhuth (Stahlhuth) and Sally J. Irwin (Irwin), in their individual capacities and as Trustee of Special Trust A F/B/O Richard J. Stahlhuth of the Virginia Hunter Grantor Retained Income Trust Dated 7/25/89 and Trustee of Special Trust A F/B/O Sally J. Irwin of the Virginia Hunter Grantor Retained Income Trust Dated 7/25/89, respectively, (collectively Plaintiffs) after a non-jury trial on Plaintiffs' Second Amended Petition for Damages seeking payment under an agreement between the parties.

### Facts and Procedural History

Because this appeal arises after a non-jury trial, we view the following relevant facts in the light most favorable to the judgment. *See Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

When land is developed in St. Louis County (the County), under certain circumstances, the County sometimes imposes a Traffic Generation Assessment (TGA) on the developer to offset some of the anticipated costs associated with an increase in automobile traffic generated by the development. The County then calculates any credits (TGA credits) to which

the developer may be entitled for public road improvements the developer has made or intends to make during its development of the land. The County applies the developer's TGA credits toward the developer's TGA. The TGA credits are "tied" directly to the property being developed, i.e., run with the land, and may be transferred from one owner of the land to subsequent owners of the land, but the TGA credits for one property may not be applied to the TGA for another property.

When calculating the TGA for a particular property, the County's Department of Public Works uses a trust fund calculation form, which documents any TGA credits that are known to apply to the property at the time the TGA is performed. The trust fund calculation form is typically completed when the developer applies for a building permit or before the building permit is issued. The County generally requires the developer to pay the TGA, less any TGA credits, prior to the issuance of any building permits. Although the County is reluctant to issue building permits before it has its best estimate of the required TGA, the County sometimes issues partial permits, thereby allowing some work to begin before the TGA is paid. If the developer's project has several phases, the TGA for an individual phase must be paid before a permit for that phase can be issued. When the developer pays the TGA, the payment is deposited into a trust fund managed by the director of the County's Department of Highways and Traffic.

In the early 1990s, the Missouri Department of Transportation (MODOT) redesigned and widened Highway 141 near a parcel of land (the Property) owned by Plaintiffs. In exchange for Plaintiffs' conveyance of a portion of the Property to MODOT for the Highway 141 project, the County agreed to issue to Plaintiffs TGA credits for the Property. This was a very unusual, likely unique, transaction. The County allowed the TGA credits to be applied only in connection with any future development of the Property. Plaintiffs were not allowed to apply the TGA credits toward the development of any other property. The County did not place a value on the TGA credits at the time it agreed to issue them to Plaintiffs.

Several years later, in October 2004, Plaintiffs simultaneously entered into two contracts with Balen, LLC, which was a straw party for SSM. The first contract was a land sale agreement for the Property. The second contract was a Traffic Generation Assessment Credit Agreement (TGA Credit Agreement) under which Plaintiffs' agreed to sell their TGA credits to Balen, LLC. Balen subsequently assigned both contracts to SSM. SSM intended to develop the Property by constructing a new hospital and medical office building complex (the Development). The TGA Credit Agreement provided, in pertinent part:

B. [Plaintiffs] had certain property adjacent to the Property taken without compensation during the relocation of State Highway 141 and [Plaintiffs] will obtain from [the County] [TGA] credits ... as consideration to [Plaintiffs] for such taking.

C. In connection with [SSM's] proposed development of the Property, [SSM] may be obligated to pay a traffic generation assessment to [the County] with respect to its development of the Property ... and [SSM] may receive from [the County] certain [TGA] credits ... for certain improvements made by [SSM] to the Property or in or adjacent to the right of way near or adjacent to the Property or for other reasons, which [SSM's] Credits shall be a credit against the required ... TGA.

D. Subject to the terms and conditions contained herein, [Plaintiffs] desires (sic) that [SSM] purchase from [Plaintiffs] all or a portion of [Plaintiffs'] Credits as provided herein.

. . .

3. TRAFFIC GENERATION ASSESSMENTS. No later than two (2) weeks prior to [SSM] submitting its rezoning application to [the County], [SSM] shall provide written notice thereof to [Plaintiffs].

Upon the issuance of [Plaintiffs'] Credits by [the County's Highway Department], [Plaintiffs] shall promptly deliver to [SSM] the letter of notification . . . of the issuance of [Plaintiffs'] Credits or such other written proof . . . of the issuance of such [Plaintiffs'] Credits. . . .

If and when [SSM's] TGA and [SSM's] Credits are determined, [SSM] shall notify [Plaintiffs'] Representatives in writing of the amounts thereof. If [SSM] develops the Property and [SSM's] TGA exceeds [SSM's] Credits, [SSM] hereby agrees to purchase from [Plaintiffs], and [Plaintiffs] agrees to sell to [SSM], [Plaintiffs'] Credits on a dollar for dollar basis, but the maximum amount of [Plaintiffs'] Credits that [SSM] shall be obligated to buy hereunder shall not exceed the amount that [SSM's] TGA exceeds [SSM's] Credits.

This Agreement contemplates that [SSM] will first use [SSM's] Credits if and when all or any portion of [SSM's] TGA is payable. After all of [SSM's] Credits (if any) have been fully utilized against any [SSM's] TGA, if [SSM] has any remaining . . . TGA obligations, [SSM] shall purchase from [Plaintiffs] all or a portion of [Plaintiffs'] Credits as provided herein and subject to the terms of this Agreement.

Each time that [SSM] is required to purchase an amount of [Plaintiffs'] Cred-

its under the terms of this Agreement, there shall be a separate sale and Closing hereunder. [SSM] shall notify [Plaintiffs] no less than two (2) weeks prior to the date that [SSM] desires to obtain building permits for all or a portion of its development of the Property and to pay all or a portion of [SSM's] TGA using all or a portion of [Plaintiffs'] Credits. The parties acknowledge that [SSM] may acquire [Plaintiffs'] Credits in portions (regardless of the amount) in separate Closings regardless of the amount of [SSM's] TGA. If requested by [SSM] in writing, [Plaintiffs] shall assign to [SSM] [Plaintiffs'] interest in those [Plaintiffs'] Credits being acquired by [SSM] at said closing pursuant to an assignment substantially in the form attached hereto . . . which assignment shall be executed by [Plaintffs] and delivered to [SSM] within ten (10) days after delivery of said request. [Plaintiffs'] Credits being acquired by [SSM] at each Closing shall be referred to herein as the "Transferred Credits."

In June 2005, the County issued a letter to Plaintiffs documenting their TGA credits for the Property and valuing them at $1,571,506.16. The letter also specifically allowed Plaintiffs to transfer their TGA credits to a future purchaser of the Property so that the purchaser could then apply the transferred credits to any TGA the purchaser might accrue when developing the Property. In October 2005, the sale of the Property closed.

In March 2006, SSM's Executive Director of Design and Construction, Donald Wojtkowski (Wojtkowski), met with County employees to discuss the permitting process and to determine how any TGA credits would be applied to any TGA the County might impose on the Development. SSM intended to build the Development in phases using "lean construction" or "just-

in-time construction," which meant the hospital and medical office building would be designed as they were built. This type of construction mandated a "pretty rigid construction timeline," and any interference with the schedule, including delays in the permitting process, would negatively affect the cost of the Development. The County informed Wojtkowski that Plaintiffs' TGA credits associated with the Property in fact existed and that the County would apply Plaintiffs' TGA credits to the TGA for the Development when SSM obtained building permits for the hospital phase and the medical office building phase of construction; thus, there would be nothing to hold up the permitting process. Later that month, the County enacted Ordinance No. 22,712, establishing the rate by which SSM's TGA for the Development would be calculated at $3,006.94 per parking space.

On November 27, 2006, the County issued a Trust Fund Form documenting the TGA for the hospital phase of the Development, which was calculated according to the method described in Ordinance No. 22,712 and totaled $704,033.76.[1] The Trust Fund Form indicated that the TGA for the hospital phase of the Development was to be paid prior to the issuance of building permits for that phase. The Trust Fund Form also informed SSM that the TGA credits previously issued to Plaintiffs totaled $1,571,506.16 and $704,033.76 of Plaintiffs' TGA credits would be applied toward the TGA for the Development, resulting in a TGA credit balance of $867,472.40. SSM had no TGA credits of its own as of that date.

In December 2006, SSM applied for and the County issued the building permits for the hospital phase of construction. Despite the terms of the TGA Credit Agreement, SSM did not notify Plaintiffs of the TGA the County had imposed or that the County had applied some of Plaintiffs' TGA credits toward the TGA for the Development. SSM did not pay Plaintiffs for their TGA credits.

In April 2007, Plaintiffs discovered that some of their TGA credits had been applied toward the TGA for the hospital phase of the Development. Plaintiffs subsequently demanded payment from SSM under the terms TGA Credit Agreement plus interest accruing from the date payment was due, November 27, 2006, and attorneys' fees. SSM refused to pay Plaintiffs and sent Plaintiffs a letter claiming that the TGA Credit Agreement did not require SSM to purchase Plaintiffs' TGA credits until SSM's TGA and SSM's TGA credits were determined by the County. Meanwhile, however, Wojtkowski sent the County's Public Works Department a letter acknowledging SSM's TGA for the hospital phase of the Development totaled $704,033.76.

In the fall of 2007, SSM notified Plaintiffs that SSM was applying for building permits for the medical office building phase of the Development but did not pay Plaintiffs for any TGA credits SSM might use to obtain the permits. On January 24, 2008, the County issued a Trust Fund Form documenting the TGA for the medical office building phase of the Development, which was calculated according to the method described in Ordinance No. 22,712 and totaled $702,425.87. The Trust Fund Form indicated that the TGA for the medical office building phase of the Development was to be paid prior to the issuance of the building permit for that phase. The Trust Fund Form also informed SSM that the existing TGA credit balance of

---

1. According to the Trust Fund Form, the TGA for hospital phase of the Development result-

ed from an original TGA of $736,702.00 minus $32,668.24 of "Credit for Previous Use."

$867,472.40 would be applied to the TGA due, resulting in a new TGA credit balance of $165,046.53.

In March 2008, the County issued a letter to SSM confirming the accuracy of the TGA rate recorded in Ordinance No. 22,712 and the TGA credits for the hospital and medical office building phases of the Development documented in the previously issued Trust Fund Forms. The letter also informed SSM that the remaining TGA credits would "be available for future phases of the [Development] at this site."

On May 7, 2008, Plaintiffs filed their Second Amended Petition[2], alleging that SSM had breached the TGA Credit Agreement by failing to pay Plaintiffs for their TGA credits SSM had applied to its TGA in relation to the Development.

On May 13, 2008, the St. Louis County Council (County Council) enacted Ordinance No. 23,604, thereby repealing and amending the section of Ordinance No. 22,712 that set the rate by which the TGA for the Development would be calculated but otherwise leaving Ordinance No. 22,712 intact. Ordinance No. 23,604 reduced the rate by which the TGA for the Development would be calculated for construction approved prior to January 1, 2009. On May 30, 2008, just a few days prior to trial, the County issued two new Trust Fund Forms, which recalculated the TGA for both the hospital phase and the medical office building phase of the Development according to the reduced rate set out in Ordinance No. 23,604. Ordinance No. 23,604 set the rate at $1,668.47 per hospital parking space and $2730.25 per loading space.

The same day the new Trust Fund Forms were issued, SSM filed its response to Plaintiffs' Second Amended Petition, specifically denying that it had requested the application of Plaintiffs' TGA Credits to the TGA for the Development and essentially disputing its obligations under the terms of the TGA Credit Agreement. SSM also asserted several affirmative defenses, alleging that: (1) Plaintiffs failed to state a claim upon which relief could be granted; (2) Plaintiffs' action was premature and unripe because it was filed prior to the satisfaction of conditions precedent to their recovery, i.e., prior to the final determination of the TGA for the Development and SSM's TGA Credits; (3) SSM had tendered a payment it believed was a "good faith estimate" of the amount owed for utilizing Plaintiffs' TGA Credits under the TGA Credit Agreement; and (4) Plaintiffs had breached their duty of good faith and fair dealing under the TGA Agreement by "actively recruiting one or more employees of [the County] to refuse to issue a final accounting of SSM's TGA obligations on the [Development]. . . .

On the morning of trial, SSM tendered a check for $646,033.12 as payment for SSM's use of Plaintiffs' TGA credits. Plaintiffs refused to accept the payment in satisfaction of their claims against SSM on the ground that it was not a full payment under the terms of the TGA Credit Agreement because Plaintiffs believed that the total amount owed to them was $1,406,459.63 calculated using the rate in Ordinance No. 22,712.

Following trial, by consent of the parties, the trial court ordered the parties to submit findings of fact and conclusions of law and allowed the parties to file replies to each other's findings and conclusions. Later, after reviewing the parties' findings and conclusions and replies, the trial court

---

2. Plaintiffs filed their initial petition alleging that SSM had breached the TGA Credit Agreement in June 2007, prior to SSM's application for the building permit for the medical office building phase of the Development.

entered its judgment in favor of Plaintiffs, concluding that SSM had breached the TGA Credit Agreement in two instances by failing to pay Plaintiffs for their TGA credits when the County applied Plaintiffs' TGA credits against SSM's TGA on November 27, 2006, and on January 24, 2008. The trial court awarded Plaintiffs a total of $760,426.51 in principal plus a total of $98,355.70 in interest, for a grand total of $858,782.21. Costs were assessed against SSM.

Plaintiffs subsequently filed their Motion to Amend Judgment (Motion to Amend) and their Motion for Attorneys' Fees and Expenses. In their respective motions, Plaintiffs sought the recovery of prejudgment interest on certain previously awarded principal amounts plus costs and attorneys' fees.

After a hearing on the Motion to Amend in which evidence was adduced, the trial court entered its Amended Judgment finding that: (1) SSM's TGA for the Development, in the amount of $704,033.76, was due and payable as of November 27, 2006; (2) SSM had no TGA credits of its own on that date; (3) the County issued building permits to SSM "without delay" for the construction of the Development based on the existence of Plaintiffs' TGA credits, which the County applied against SSM's TGA; (4) SSM did not pay Plaintiffs for Plaintiffs' TGA credits when the County applied those TGA credits toward SSM's TGA; and (5) SSM paid Plaintiffs the sum of $646,033.12 in June 2008. The trial court concluded that SSM had breached the TGA Agreement twice: when it failed to pay Plaintiffs for their TGA credits at the time the County accepted those TGA credits and applied them toward the TGA calculated on November 27, 2006, and on January 24, 2008. The trial court thereafter found SSM was obligated to pay Plaintiffs a total of $1,026,359.34, which re-flected: (1) the principal amount of $58,000.64, which was the difference between the total value of Plaintiffs' TGA credits SSM used on November 27, 2006 ($704,033.76) and the payment SSM had tendered prior to trial in June 2008 (646,-033.12), plus $98,355.70 in prejudgment interested calculated on that amount; (2) the principal amount of $702,425.87, plus $27,885.20 in prejudgment interest calculated on that amount; (3) costs, assessed at $2,597.93; and (4) attorneys' fees, in the total amount of $137,094.00.

SSM thereafter filed its Motion to Vacate, Re–Open, Correct and/or Modify the Judgment or, in the alternative, Motion for New Trial (Motion for New Trial), which was called, heard, submitted, and denied. This appeal follows.

Additional facts will be discussed as necessary to our analysis of the issues on appeal.

## Standard of Review

■ In a court-tried case, we will affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or the trial court erroneously declared or applied the law. *Alea London Ltd. v. Bono–Sol-tysiak Enterprises,* 186 S.W.3d 403, 409 (Mo.App. E.D.2006); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We view the evidence and inferences therefrom in the light most favorable to the prevailing party and disregard all evidence to the contrary. *Alea London,* 186 S.W.3d at 410. Although we defer to the trial court's factual findings and give due regard to the court's determination of the credibility of witnesses, when resolving contractual ambiguities, we are faced with a question of law, which we review *de novo. Monsanto Company v. Syngenta Seeds, Inc.,* 226 S.W.3d 227, 230 (Mo.App.

E.D.2007); *Alea London,* 186 S.W.3d at 409–10.

### · Discussion

SSM presents two points on appeal. Because SSM's claims are interrelated, we address the points together.

In its first point, SSM claims the trial court erred in entering its Amended Judgment and in denying SSM's Motion for New Trial because the court improperly construed the TGA Credit Agreement. SSM asserts that "the trial court disregarded the unambiguous terms of the TGA [Credit] Agreement and reached a conclusion inconsistent with the intent of the parties."

In its second point, SSM claims the trial court erred in entering its Amended Judgment and in denying SSM's Motion for New Trial because the Amended Judgment was against the weight of the evidence. SSM argues that the trial court ignored evidence demonstrating that the County nullified and superseded the original TGA rate, on which the court relied in reaching its decision, by repealing Ordinance No. 22,712 and enacting Ordinance No. 23,604 and that Plaintiffs' TGA credits remained intact until applied by the County in conjunction with the issuance of SSM's TGA credits and the "valid" TGA rate for the Development.

The interpretation and construction of a contract are questions of law, which we review *de novo* and without deference to the trial court's construction. *Monsanto,* 226 S.W.3d at 231; *Rathbun v. CATO Corp.,* 93 S.W.3d 771, 778 (Mo.App. S.D. 2002).

 "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428

(Mo. banc 2003). In determining the parties' intent, the courts look to the language of the contract, giving the terms their plain, ordinary, and usual meaning and so construing the terms to avoid rendering other terms meaningless. *TAP Pharmaceutical Products Inc. v. State Bd. of Pharmacy,* 238 S.W.3d 140, 143 (Mo. banc 2007); *Monsanto,* 226 S.W.3d at 231. A construction that attributes a reasonable meaning to all of the contract provisions is preferable to one that leaves some provisions without function or sense. *Monsanto,* 226 S.W.3d at 231. If the language of the agreement addresses the matter in dispute, the inquiry ends. *TAP,* 238 S.W.3d at 143. If the language is not clear, however, the court turns to other tools of construction to determine what the parties' intent in making the agreement. *Id.* When making such a determination, the court will consider: (1) the language within the context of the entire contract; (2) the relationship between the parties; (3) the subject matter of the contract; (4) the practical construction the parties have placed on the contract by their acts and deeds; and (5) other external circumstances that cast light upon the parties' intent. *Id.*

With regard to SSM's first point, SSM essentially argues that its obligation to pay for the use of Plaintiffs' TGA Credits did not arise when the TGA for the Development was calculated on November 27, 2006, and on January 24, 2008, because the TGA calculated on those dates was based on an "invalid" TGA rate contained in Ordinance No. 22,712. SSM further argues that its obligation to pay Plaintiffs for the use of their TGA credits was triggered by the Trust Fund Form calculated in May 2008 based on the "valid" TGA rate contained in Ordinance No. 23,604. We disagree.

The plain language of the TGA Credit Agreement provided that SSM's obligation to purchase Plaintiffs' TGA credits arose when (1) all or any portion of SSM's TGA for the Development became payable and (2) after all of SSM's own TGA credits, if any existed, had been fully applied against the TGA owed by SSM and there remained a balance.

The evidence at trial established that the TGA for the Development became payable when SSM applied for building permits and the County calculated and issued corresponding Trust Fund Forms on November 27, 2006, and on January 24, 2008. The Trust Fund Forms notified SSM of the amount of the TGA for the hospital phase and the medical office building phase of the Development, which was required to be paid prior to the issuance of building permits. The Trust Fund Forms also notified SSM of the amount of Plaintiffs' existing TGA credits, which would be applied toward SSM's TGA for the Development. Neither of those Trust Fund Forms attributed any TGA credits to SSM.

Garry Earls (Earls), the County's Chief Operating Officer[3], testified that the County used Trust Fund Forms to determine whether a developer owed a TGA before a permit could be issued. Earls testified that Trust Fund Forms were "intended almost as an invoice to the developer" of a particular property and provided proof of the number of existing TGA credits the developer could apply against the TGA. While Earls acknowledged that his staff had received several requests from SSM "to help expedite" the permitting process for the Development and that the County might have issued partial permits allowing SSM to prepare the foundation and to grade the Property, no County

employee had been authorized to issue permits for "the vertical construction" without SSM first satisfying its TGA for the Development.

John Watson (Watson), a zoning enforcement officer for the County, testified that he was responsible for calculating TGA amounts for the County and that developers were required to pay their TGA amounts before being issued building permits. Watson testified that a developer's TGA credits normally were calculated and applied before the TGA amount was paid but a decision by the developer to apply for building permits before its TGA credits were calculated did not excuse the developer from paying its TGA before the building permits were issued. If a developer's project was to be completed in phases, the developer was required to pay the TGA for a particular phase before a building permit would be issued for that phase. With regard to the Development, Watson testified that individual Trust Fund Forms were generated on November 27, 2006, and on January 24, 2008, when SSM applied for building permits for the hospital phase and the medical office building phase, and that SSM's TGA was "payable" as of those dates. Watson acknowledged that he had prepared the Trust Fund Forms, which documented the TGA credits originally issued to Plaintiffs. Watson also acknowledged that the County had applied Plaintiffs' TGA credits to SSM's TGA for the Development, thereby satisfying SSM's TGA and resulting in a TGA credit balance, which SSM could use toward any future TGA liability incurred from constructing additional facilities associated with the Development.

**3.** Before becoming the County's Chief Operating Officer, Earls was employed as the director of the County's Department of Public

Works and as the director of the County's Department of Highways and Traffic.

Wojtkowski, SSM's Executive Director of Design and Construction, testified that SSM was utilizing a new "lean construction" or "just-in-time construction" process for the Development to save SSM money. Wojtkowski also testified that SSM anticipated future construction for the Development, which would "double in size" and would require the use of additional TGA credits. George Stock (Stock), the president of a civil engineering firm that worked on the Development, testified that his firm "diligently pursue[d] the issuance of the [TGA] credits" because delays in obtaining building permits for the Development would have impacted the construction schedule. Stock further testified that SSM imposed the construction schedule on itself as part of its "lean construction" methods.

■ Based on the plain language of the TGA Credit Agreement and given the evidence at trial, it can be inferred that it was the parties' intent to enter into a contract by which Plaintiffs would receive consideration for their existing TGA credits and SSM would receive the benefit of using Plaintiffs' TGA credits to procure the expeditious issuance of building permits from the County so that SSM could proceed with its economically-advantageous "lean construction" of the Development. Consequently, the trial court reasonably and correctly determined that SSM's obligation to purchase Plaintiffs' TGA credits arose on November 27, 2006, and on January 24, 2008.

■ We also disagree with SSM's contention that the TGA rate in effect in November 2006 and January 2008 was "invalid," thus, SSM's obligation to purchase Plaintiffs' TGA credits did not arise until a "valid" rate, i.e., the rate approved by the County Council in May 2008 and set forth in Ordinance No. 23,604, was in effect.

First, the record is devoid of any evidence indicating that there was a disagreement or even a question regarding the validity of the TGA rate at the time the County calculated the TGA for the hospital phase or for the medical office building phase. In fact, in May 2007, *after* the TGA for the hospital and the medical office building phases had been calculated and Plaintiffs' TGA credits had been applied, Wojtkowski addressed a letter to the County referencing the hospital phase of the Development and acknowledging, without disputing, the TGA rate in effect and used by the County to calculate the TGA Trust Forms issued on November 27, 2006, and on January 24, 2008. At trial, Wojtkowski admitted that the letter contained his calculation of the TGA SSM owed for the hospital phase based upon the "TGA rates that were in place" and that Plaintiffs' TGA credits were used to obtain building permits for the hospital and the medical office building phases.

Second, even if there had been a dispute about the TGA rate in effect on a particular date, the evidence established that the County expressly required SSM to pay its TGA, through either TGA credits or by paying into a designated trust fund, *before* obtaining building permits for construction. In addition, the evidence indicated that the County did not simply disregard any TGA credits remaining after the issuance of the building permits for the hospital and medical office building phases but included the remaining TGA credits, which under the terms of the TGA Credit Agreement could be used toward any future TGA liability incurred from constructing additional facilities associated with the Development.

Accordingly, we conclude that the trial court properly construed the TGA Credit Agreement. SSM's first point is denied.

With regard to SSM's second point, SSM essentially argues that the weight of the evidence established Ordinance No. 22,712 was repealed by the enactment of Ordinance No. 23,604, which reduced the TGA rate and changed the TGA calculation and, as a result, Ordinance No. 22,712 is void. However, we note that, once an ordinance is repealed, its previous effect is not necessarily invalidated even though it becomes prospectively ineffective. *R.E.J., Inc. v. City of Sikeston*, 142 S.W.3d 744, 745 (Mo. banc 2004). In contrast, to declare an ordinance "void" means that it never had the authority to create any legal rights or responsibilities whatsoever. *Id.*, 142 S.W.3d at 746. Based on the record before us, we conclude that there is nothing to suggest Ordinance No. 22,712 was invalid at the time it was enacted or at the times SSM's obligations under the TGA Credit Agreement arose. On the eve of trial, the County enacted Ordinance No. 23,604, which amended Ordinance No. 22,712, changed the TGA rate, and changed the calculations. This action can only affect the rights and obligations of the parties going forward; it cannot undo the previous breach or cause a recalculation of established damages. In *Leonard v. American Walnut Company, Inc.*, a case involving the sale of standing timber, the Court held that "[t]he damage from the contract breach is neither reduced nor increased by subsequent events because the amount is set by values on the sale date." 609 S.W.2d 452, 455 (Mo.App. W.D.1980). Here, the damages from the contract breaches were set by the terms of the TGA Credit Agreement and the rate found in Ordinance No. 22,712 then in effect. As a result, the trial court's computation of the damages due to the breach of contract was proper based on the existing TGA rate. Accordingly, the trial court did not err in entering its Amended Judgment, which was supported by substantial evidence in the record. Point denied.

*Conclusion*

The Amended Judgment of the trial court is affirmed.[4]

KATHIANNE KNAUP CRANE, Presiding Judge, Concurs.

KENNETH M. ROMINES, Judge, Dissents in separate opinion.

KENNETH M. ROMINES, Judge, dissenting.

I dissent. The majority states the facts accurately, and states the law concerning repealed city ordinances correctly, although I do not believe this application is relevant under our facts. I depart as to how the damages are to be calculated.

The parties entered into a contract by which *St. Louis County* would determine an amount SSM owed, and after applying SSM's own credits, SSM would then purchase additional needed credits from Stahlhuth. SSM owed $1,406,459.63 as of 24 January 2008. The *County* applied Stahlhuth's credits in that amount to satisfy the TGA fees. SSM did not pay Stahlhuth within five days—as required by the contract—for these credits. At this point, SSM breached the contract.

In May 2008, the County calculated the amount SSM owed, and determined that it was actually $1,065,999.97. The County further found that SSM had its own credits in the amount of $415,966.85. Therefore, SSM still owed $646,033.12. *The County* applied credits in that amount

4. In affirming this Amended Judgment, we are not determining the parties' future rights or obligations under the TGA Credit Agreement, if any, including any that may have been affected by Ordinance No. 23,604, enacted in May 2008.

from Stahlhuth, leaving the rest of Stahlhuth's credits intact, and SSM paid Stahlhuth $646,033.12.

The trial court determined SSM breached the contract, which is true: SSM owed money in January 2008 and paid nothing until June 2008. The next task is to determine damages. It seems to me, damages are determined as the amount owed by SSM after the County calculates the credits at issue. We should look at the plain language of the contract to determine the amount owed. If we do that, we see that the amount owed Stahlhuth is *whatever* the County determined SSM owed, minus SSM's own credits. On the date of trial, looking to those amounts, the answer is $646,033.12. This is the amount to which Stahlhuth was entitled. SSM in fact paid this amount. Therefore, there are no damages remaining, other than interest, costs, and attorney's fees.

Stahlhuth's unused credits remain intact. It had $1,571,506.16, and SSM used/purchased $646,033.12. *The rest remains,* and in the event SSM adds new phases to its project or revamps the project entirely, prompting a new TGA, SSM will be liable under the contract for any use of those remaining credits. Stahlhuth has not been deprived of any of its credits. Were SSM required to pay more than $646,033.12, then Stahlhuth has the benefit of payment for credits that went unused. That was not the agreement and a breach does not entitle Stahlhuth to more than he would have received under the contract.

Stahlhuth goes on to argue that the County's repeal of the first ordinance and subsequent recalculation of the TGA were invalid, but Stahlhuth 1) *did not raise these arguments at trial,* and 2) *has no standing* to raise this issue in this case.

Before the sale of the property, Stahlhuth had a certain number of credits, worth approximately $1.5 million—these credits run with the land.[5] The only reason Stahlhuth was entitled to *any compensation* for them at all was the existence of the contract with SSM-there clearly being no open market for these credits. The County's actions pertaining to the credits do not affect Stahlhuth's interest in them whatsoever, thus Stahlhuth cannot claim harm, apart from the contract, through the passage of a new ordinance. The County is free to do so, and any challenge to the validity of the County's actions would have had to come at the trial level through a party with standing suing the County. Stahlhuth may claim no relief in that respect here.

For these reasons, I would reverse and remand for the calculation of interest, costs, and attorney fees on $646,033.12.

---

5. Whatever that could mean in County speak.