

# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

| | | |
|---|---|---|
| MOBILE NATIONAL DEVELOPMENT CO., LLC, | ) | No. ED112409 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | 21SL-CC00011 |
| | ) | |
| SPECTRUM MID-AMERICA, LLC, | ) | Honorable Thomas C. Albus |
| | ) | |
| Respondent. | ) | Filed: October 29, 2024 |

Before James M. Dowd, P.J., Angela T. Quigless, J., and Cristian M. Stevens, J.

**Opinion**

This dispute centers on a June 19, 2003, contract between cable television provider Charter

Communications I, LLC[1] and Mobile National Development Co., LLC, a Missouri company that owns

and operates the St. Peters, Missouri mobile home park Eldorado Estates. In that contract, Mobile

granted Charter an exclusive easement and access to Eldorado to install and maintain cable television

facilities and to offer cable service to residents in exchange for 27.4 percent of the cable television

revenue and 7.5 percent of the cable modem service revenue Charter generated there. Charter paid

Mobile under this agreement until April 15, 2020, when it notified Mobile it was terminating the 2003

contract in light of a 2007 Federal Communications Commission order (the FCC Order) that barred

---

[1] Throughout this litigation, including on appeal after "Spectrum Mid-America, LLC," the successor entity to Charter Communications I, LLC, was ordered substituted as the proper party, the parties have continued to use "Charter" to describe the Respondent.

cable companies from enforcing certain exclusivity clauses in contracts between cable companies and multiple dwelling units such as apartment complexes and mobile home parks.

On December 31, 2020, Mobile sued Charter (1) for breach of the 2003 contract, (2) for a declaratory judgment that the contract's exclusivity provision was not subject to the FCC Order, and (3) for specific performance to require Charter to continue paying Mobile under the contract. In its amended petition, Mobile added breach of contract and specific performance claims against Charter relating to a 1990 cable television agreement between Mobile and a predecessor cable company, TCI Cable Vision of Missouri, Inc. (TCI), the assets of which Charter purchased in 2001.

Charter counterclaimed for restitution of the amounts it had paid under the contract from 2007 to 2020, for rescission, and for a declaratory judgment that the 2007 FCC Order voided its obligation to pay Mobile under the 2003 contract. Charter then filed its motion seeking summary judgment on Mobile's claims and on its own counterclaims for declaratory judgment and restitution.

In granting Charter's summary judgment motion, the court voided in its entirety the parties' 2003 contract based on the FCC Order's mandate against exclusivity clauses in such contracts. Further, the court rejected Mobile's claims regarding the 1990 agreement because the 2003 agreement's integration clause subsumed all prior agreements between the parties. Finally, the court denied Charter's other claims including for restitution. Mobile appealed.

In point one, Mobile claims the exclusivity provision in its contract with Charter is *not* the type of exclusivity provision to which the FCC Order applies because it does not unambiguously require Mobile to exclude all competitors from accessing its property to offer cable services to residents. We disagree because the plain language of the 2003 agreement grants Charter the exclusive right to provide cable services to Mobile's residents which we find to be in direct violation of the FCC Order barring cable operators from enforcing or executing "any provision in a contract that grants to it the

2

exclusive right to provide any video programming service (alone or in combination with other services) to a MDU [multiple dwelling unit]."

In point two, Mobile alleges the trial court should not have voided the *entire* 2003 agreement but should have deleted only certain language. Specifically, Mobile seeks to strike (1) the words "or compete" from section 5(c) of the agreement, which grants Charter exclusive access to install cable at Eldorado, and (2) the word "exclusive" from section 1 of the contract's addendum that outlines the share of revenue Charter agreed to pay Mobile in exchange for Charter's exclusive access. Mobile then claims that with those edits, Charter would continue to owe the consideration outlined in the addendum, that is, 27.4 percent of Charter's cable television revenue and 7.5 percent of its cable modem service revenue, in exchange for Charter's *non*-exclusive access to Eldorado's residents.

While we agree that the trial court should not have struck the entire agreement, we disagree with Mobile's proposed solution. Instead, we conclude that the trial court should have struck "or compete" from section 5(c) and the entire addendum to the agreement. The remaining terms of the agreement survive these excisions.

Finally, we deny Mobile's third point regarding the 1990 agreement because that agreement did not survive the unambiguous integration clause in the parties' 2003 agreement.

## Background

### A. The 1990 Contract

In a 1990 contract, Mobile granted to TCI Cable non-exclusive access to Eldorado to install, own, and maintain cable service equipment and to offer cable services to residents in exchange for 27.4 percent of the gross revenue TCI Cable collected there. The agreement was binding on "successors, assigns, heirs, and personal representatives." In 2001, Charter acquired the assets of TCI Cable and continued paying Mobile 27.4 percent of its gross revenue until June 2003.

3

*B.  The 2003 Contract*

In June 2003, Charter and Mobile executed a new agreement to govern their relationship.  The 2003 contract contains several provisions relevant to this appeal.  First, section 5(c) provides that Mobile "has not granted, and will not grant, any other easements or rights which will physically interfere or compete with the operation within the Complex of [Charter's] Service or Equipment, except for telephone, gas, electric, water, sewer, and any other service normally required by any governmental agency having jurisdiction."  Next, the addendum incorporated into the 2003 contract provides that, "No other payment, compensation, or remuneration (monetary or other), except that set forth in Sections 1(a) [27.4 percent of cable television service revenue] and 1(b) [7.5 percent of cable modem service revenue] of this Addendum, will be due and owing to [Mobile] by [Charter] during the term of this agreement with regard to [Mobile's] grant to [Charter] of exclusive access to the Premises except for phone services or those services which may be offered by a competing service provider."

Finally, the 2003 agreement contains a severability clause and an integration clause.  The severability clause provides that "[i]f any part of this Agreement is invalid or unenforceable under applicable law, the provision shall be ineffective only to the extent of such invalidity or unenforceability without in any way affecting the remaining parts of the provisions of this Agreement."  And the integration clause provides "[t]his agreement supersedes and replaces any and all other agreements, either oral or written, between the parties hereto relating to the subject matter hereof."

*C.  The 2007 FCC Order*

On November 13, 2007, the FCC issued its "2007 Exclusivity Order," codified at 47 C.F.R. § 76.2000(a), which provides: "(a) Prohibition.  No cable operator ... shall enforce or execute any provision in a contract that grants to it the exclusive right to provide any video programming service

(alone or in combination with other services) to a MDU [multiple dwelling unit]. All such exclusivity clauses are null and void." The Order included mobile home parks as MDUs.

*D. Summary Judgment*

On May 19, 2022, Charter filed a motion for summary judgment on all counts of Mobile's petition and on the declaratory judgment and restitution counts in Charter's counterclaim. As to its declaratory judgment counterclaim, Charter claimed the 2007 FCC Order voided its revenue sharing obligations because they were founded on the now-illegal exclusivity provision of the 2003 contract. On December 28, 2023, the trial court issued its judgment. The court held (1) the FCC Order voided the parties' 2003 agreement *in toto;* and (2) the 2003 agreement superseded the 1990 agreement such that the 1990 agreement afforded Mobile no right to any relief or to any defense.

**Standard of Review**

Summary judgment is appropriate when the movant establishes that the material facts are undisputed and they are entitled to judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 377 (Mo. banc 1993); Rule 74.04(c). A genuine issue of material fact exists when there is competent evidence of two plausible, but contradictory, accounts of essential facts. *Armoneit v. Ezell*, 59 S.W.3d 628, 631 (Mo. App. E.D. 2001). Thus, a defendant is entitled to summary judgment when he shows undisputed facts that negate any one of the necessary elements of the plaintiff's claim. *Blackwell Motors, Inc. v. Manheim Services Corp.*, 529 S.W.3d 367, 379 (Mo. App. E.D. 2017).

We review an appeal challenging the grant of a motion for summary judgment *de novo*. Thus, we do not defer to the trial court's order granting summary judgment "because the trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law." *Barry Harbor Homes Ass'n v. Ortega*, 105 S.W.3d 903, 906 (Mo. App. W.D. 2003). "Rather, we use the

5

same criteria the trial court should have employed in initially deciding whether to grant summary judgment." *Id.* We view the record in the light most favorable to the nonmoving party and afford that party the benefit of all inferences which may be reasonably drawn from the record. *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo. App. S.D. 2007) (citing *ITT Commercial Finance Corp.*, 854 S.W.2d at 376)). Moreover, summary judgment is an extreme and drastic remedy, and appellate courts should remain cautious in affirming such judgments. *Clark v. SSM Healthcare St. Louis*, 666 S.W.3d 210, 214 (Mo. App. E.D. 2023) (citing *Boone County v. Boone County Employees' Retirement Fund*, 26 S.W.3d 257, 260 (Mo. App. W.D. 2000)).

"Where construction of a contract is at issue and the contract is unambiguous on its face, summary judgment is appropriate." *Northwest Plaza, L.L.C. v. Michael-Glen, Inc.*, 102 S.W.3d 552, 557 (Mo. App. E.D. 2003) (citation omitted). "Summary judgment is inappropriate in an action arising out of a contract, however, where the disputed contract language is ambiguous and parole evidence is required to interpret the contract and the parties' intent." *Id.* "Whether a contract is ambiguous is a question of law." *Id.*

## Discussion

### I.

First, we address whether the exclusivity language in the parties' 2003 agreement clashes with the FCC Order. By way of background, in 1992, Congress enacted the Cable Television Consumer Protection and Competition Act to address the lack of competition in the cable industry. *Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsdowne, LLC*, 713 F.3d 187, 192-93 (4th Cir. 2013). With this legislation, Congress sought to address that "most cable television subscribers have no opportunity to select between competing cable systems" and "that cable prices were rising

6

almost three times faster than the rate of inflation." *Id*. at 192. The Act authorized the FCC to enact regulations to prohibit anticompetitive conduct. *Id.*

The FCC's review of exclusivity clauses in cable operators' contracts with MDUs, culminating in the 2007 Order, emerged from this congressional authorization. First, the FCC solicited comments on the issue from interested parties including cable operators, industry analysts, and consumers. Many commented that exclusivity clauses "have the clear effect of barring new entry into MDUs by wire-based video providers and that such clauses were widespread and increasing in their use." *Landsdowne*, 713 F.3d at 192. The resulting FCC Order mandated that "no cable operator . . . shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU. Any such exclusivity provision shall be null and void." 47 C.F.R. § 76.2000(a).

The question becomes then whether the parties' 2003 exclusivity provision violates the FCC Order and for that we lean on our well-worn rules of contract interpretation. "The cardinal rule of contract interpretation is to ascertain the parties' intention and give effect to that intention." *Newco Atlas, Inc. v. Park Range Const., Inc.*, 272 S.W.3d 886, 891 (Mo. App. W.D. 2008) (quoting *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 479 (Mo. App. W.D. 2002)). "Where the language of the contract is unambiguous, the intent of the parties will be ascertained from the language of the contract alone and not from extrinsic or parole evidence of intent." *Id*. "A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Id*. (citation omitted).

With the foregoing in mind, we conclude that the 2003 contract's exclusivity language, namely, "or compete" in section 5(c) of the contract and the entirety of the addendum, constitute the type of exclusivity provision condemned by the FCC Order.

7

Again, the contract states Mobile "has not granted, and will not grant, any other easements or rights which will physically interfere or compete with" Charter's rights under the contract. This plain language embargoes other companies from competing with Charter in providing wired cable services to Eldorado residents. Then, the addendum provides that Mobile will receive a percentage of revenue in exchange for Charter's exclusive access. The language is unambiguous that Mobile has granted to Charter exclusive access to provide wired cable service to its residents, that no other cable company may offer such services, and that Mobile's receipt under the contract of a percentage of Charter's revenue was in consideration of Charter's *exclusive* access.

For its part, Mobile contends that the exclusivity language in the 2003 agreement means only that Mobile cannot grant others any right or access that will *physically* disrupt or *physically* clash with Charter's equipment but that other cable companies may compete at Eldorado so long as they do not *physically* interfere with Charter's equipment. We disagree because Mobile's argument requires that we ignore the words "or compete" from the key provision in section 5(c). This we cannot do. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 226 S.W.3d 227, 231 (Mo. App. E.D. 2007) ("We construe each term of a contract to avoid rendering other terms meaningless.").

Lastly, Mobile claims that because competitors could provide services *other than* wired cable services, the 2003 agreement's exclusivity provision did not violate the FCC Order. We are unpersuaded. The FCC Order contemplates that other such services may still be offered but solely prohibits exclusivity as to wired cable service. The illegal provision here did not have to exclude other services along with wired cable services to run afoul of the 2007 Order. Point denied.

8

## II.

In point two, Mobile claims the trial court should not have voided the entire 2003 agreement but should have struck only the words "or compete" from the contract's key phrase in section 5(c) and the word "exclusive" from the addendum.

We agree with Mobile that the trial court should not have voided the entire agreement, but we disagree with Mobile's proposed solution. We conclude that the FCC Order requires that we not only strike the words "or compete" from section 5(c) of the contract, but that we also eliminate the entire addendum which at its essence represents the exclusivity of the parties' agreement whereby Charter's payment to Mobile was in exchange for its exclusive access to Eldorado and its residents' wired cable consumption.

The FCC Order's mandate was to excise exclusivity clauses but preserve enforceable parts of agreements: "While this Order prohibits the enforcement of existing exclusivity clauses, it does not, on its own terms, purport to affect other provisions in contracts containing exclusivity clauses [and] … 'treatment of such provisions will be determined by the terms of particular contracts.'"

### A. Section 5(c) – "or compete"

At this point, we need only to reiterate the crux of our analysis in point one that the FCC Order condemned the anti-competitive effect of exclusivity clauses in these contracts. Simply put, the parties' inclusion of "or compete" in one of the key phrases of their contract describing the exclusivity of Charter's access to Eldorado cannot survive the FCC Order's mandate. But the remainder of the phrase, which pertains to Charter's non-exclusive easement for its cable equipment and non-exclusive access to Eldorado's residents, survives.

9

*B. The Addendum*

Again, the addendum calls for Charter to pay Mobile 27.4 percent of its cable television revenue and 7.5 percent of its cable modem service revenue in exchange for the exclusive access to the property and the residents. It states that this exclusivity is the *only* performance by Mobile for which Charter is paying.[2] Thus, since the FCC Order voids exclusivity provisions and the entirety of the addendum rests on exclusivity, it all must go.

Moreover, if we were to accept Mobile's position and strike only the word "exclusive" from section 1 of the addendum, Charter would be left with the obligation to share its revenue without receiving the lone benefit they agreed to pay for – that is, to be the exclusive wired cable service provider at Eldorado. So, since Mobile would have no obligations under the addendum, and Charter would remain bound to perform, we strike the entire addendum from the contract. *See Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 433 (Mo. banc 2015).

We turn next to Mobile's claim that striking the entirety of the addendum is error because the remainder of the contract would fail for lack of consideration. We disagree finding support for our decision in Missouri law and in the parties' agreement's severability clause. First, the parties' severability clause allows that "[i]f any part of any provision of this agreement is invalid or unenforceable under applicable law, the provision shall be ineffective only to the extent of such invalidity or unenforceability without in any way affecting the remaining parts of the provisions of this Agreement." This clause mimics Missouri law. *See Loc. 2379, United Auto. Aerospace & Agric.*

---

[2] No other payment, compensation, or renumeration (monetary or other), except that set forth in Sections 1(a) [27.4 percent of cable television revenue] and 1(b) [7.5 percent of cable modem service] of this Addendum, will be due and owing to [Mobile] by [Charter] during the term of this agreement with regarding to [Mobile's] grant to the [Charter] of exclusive access to the Premises except for phone services or those services which may be offered by a competing service provider.

*Implement Workers of Am. v. ABB, Inc.*, No. 03-4109, 2004 WL 3507895, at *4 (Mo. App. W.D. 2004) ("the remainder of the contract should be enforced if the unenforceable provision is severable from the rest of the contract"). And on the question of consideration, we acknowledge the general rule that "[m]utuality of contract means that an obligation rests upon each party to do or to permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Eaton*, 461 S.W.3d at 433.

The question becomes then whether, upon deleting the entire addendum and the words "or compete" from section 5(c), the remainder of the contract is supported by mutual consideration. We find that it is.

What remains is an agreement whereby Charter gets non-exclusive access to install and maintain its cable service equipment at Eldorado and non-exclusive access to offer wired cable service to Eldorado residents. For its part, Mobile receives the intangible benefit of being able to offer its residents cable service through Charter. We need not judge the value of the consideration and one party's disappointment does not denote a lack of consideration. *Weinstein v. KLT Telecom, Inc.*, 225 S.W.3d 413, 415-16 (Mo. banc 2007).

So as to point two, we reverse the trial court's decision to void the entire 2003 contract. Instead, we strike the entire addendum and the words "or compete" from section 5(c) leaving the remainder intact.

## Point III

In point three, Mobile alleges the trial court erred in finding it had no rights under the 1990 agreement because the 2003 agreement was entered into without consideration. Because the 2003 agreement was and remains supported by consideration and represents the parties' only surviving agreement relating to cable services, we deny this point.

11

First, we dispose of Mobile's argument that the 2003 agreement somehow lacked consideration and that we should therefore reach all the way back to the 1990 agreement to determine the parties' rights and obligations here. Laying aside our dubiety with regard to the timeliness of Mobile's *2021* claim that a *2003* agreement - one under which it collected hundreds of thousands of dollars - somehow fails for lack of consideration, we readily reject its argument on the merits. In the 2003 agreement that Mobile executed and about which it made no complaint until now, Mobile agreed to give Charter exclusive access to offer Eldorado residents wired cable services in exchange for a portion of Charter's revenue. That is not a contract that fails for lack of consideration. *Weinstein*, 225 S.W.3d at 415-16.

We turn then to Mobile's argument that the 1990 agreement remained viable. We conclude that it did not because the 2003 agreement's integration clause, which states it is "the entire agreement and understanding of the parties ... and supersedes any and all previous agreements," extinguished the 1990 agreement altogether.

"[T]he 'law conclusively presumes all prior and contemporaneous agreements have been merged into a written contract,' particularly when the contract contains an integration clause." *Jennings v. SSM Health Care of St. Louis*, 355 S.W.3d 526, 532 (Mo. App. E.D. 2011) (quoting *Clean Uniform Co. St. Louis v. Magic Touch Cleaning, Inc.*, 300 S.W.3d 602, 611 (Mo. App. E.D. 2009)). Integration clauses "announce[] and demonstrate[] the all inclusive-nature of the written instrument and furnish[] additional reason for applying the parole evidence rule." *Union Elec. Co. v. Fundways, Ltd.*, 886 S.W.2d 169, 171 (Mo. App. E.D. 1994). "If this were not so, few written instruments would be secure." *Id.* "Consideration either is present (and a contract is formed), or it is not." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 781 (Mo. banc 2014).

Point denied.

12

## Conclusion

We affirm in part and reverse in part. We affirm with respect to points one and three. As to point two, we reverse the judgment to the extent the trial court voided the parties' entire 2003 contract. Instead, we order stricken the entire addendum and the words "or compete" from section 5(c) of the 2003 agreement leaving the remainder intact.

_____
James M. Dowd, Presiding Judge

Angela T. Quigless, J., and
Cristian M. Stevens, J., concur.

13